## ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 22-1221, 22-1252, 22-1291 (consolidated)

THE EVERGY COMPANIES, *ET AL.*,
*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

———————————————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————————————

## BRIEF OF PETITIONERS EVERGY KANSAS CENTRAL, INC., EVERGY METRO, INC., EVERGY MISSOURI WEST, INC., AND GRIDLIANCE HIGH PLAINS LLC

———————————————

C. Dixon Wallace III
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 344-7955
dwallace@huntonak.com

John Lee Shepherd, Jr.
Ted J. Murphy
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@huntonak.com
tmurphy@huntonak.com

*Counsel for The Evergy Companies and GridLiance High Plains LLC*

December 5, 2022

Denise M. Buffington
Senior Director of Federal
  Regulatory Affairs
The Evergy Companies
1200 Main Street, 19th Floor
Kansas City, MO 64141
(816) 556-2683
denise.buffington@evergy.com

Patrick T. Smith
Corporate Counsel Director
The Evergy Companies
818 S. Kansas Avenue
P.O. Box 889
Topeka, KS 66601
(785) 508-2574
patrick.smith@evergy.com

*Counsel for The Evergy Companies*

Travis M. Contratto
FERC Attorney
NextEra Energy, Inc.
700 Universe Blvd.
LAW/SCS
Juno Beach, FL 33408
(305) 442-5066
travis.contratto@nee.com

*Counsel for GridLiance High
  Plains LLC*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners Evergy Kansas Central, Inc., Evergy Metro, Inc., and Evergy Missouri West, Inc. (collectively, The Evergy Companies), and GridLiance High Plains LLC (GridLiance) submit the following Certificate as to Parties, Rulings, and Related Cases:

## A.    Parties, Intervenors, and Amici Before the Court

The Evergy Companies
GridLiance
Federal Energy Regulatory Commission
Southwest Power Pool, Inc.
Golden Spread Electric Cooperative, Inc.
Oklahoma Gas and Electric Company
Xcel Energy, Inc.
American Electric Power Service Corporation
Kansas City, Kansas Board of Public Utilities
Missouri Joint Municipal Electric Utility Commission
Kansas Municipal Energy Agency
Kansas Power Pool
East Texas Electric Cooperative, Inc.
Northeast Texas Electric Cooperative, Inc.
Kansas Electric Power Cooperative, Inc.

## B.    Parties Before the Federal Energy Regulatory Commission

Ameren Services Company
American Electric Power Service Corporation
Basin Electric Power Cooperative
City Utilities of Springfield, Missouri
East River Electric Power Cooperative, Inc.
East Texas Electric Cooperative, Inc.

The Evergy Companies
Golden Spread Electric Cooperative, Inc.
GridLiance
Independence Power & Light, City of Independence, Missouri
ITC Great Plains, LLC
Kansas City, Kansas Board of Public Utilities
Kansas Electric Power Cooperative, Inc.
Kansas Municipal Energy Agency
Kansas Power Pool
Missouri Joint Municipal Electric Utility Commission
Municipal Energy Agency of Nebraska
Northeast Texas Electric Cooperative, Inc.
Oklahoma Gas & Electric Company
Oklahoma Municipal Power Authority
People's Electric Cooperative
Southwest Power Pool, Inc.
Southwest Transmission, LLC
Sunflower Electric Power Corporation
Western Area Power Administration
Western Farmers Electric Cooperative
Xcel Energy Services Inc.

## C.    Rulings Under Review:

1.    *Southwest Power Pool, Inc.*, Docket No. ER22-1719-000, "Order Accepting Tariff Revisions," 179 FERC ¶ 61,229 (June 28, 2022);

2.    *Southwest Power Pool, Inc.*, Docket No. ER22-1712-000, "Notice of Denial of Rehearing by Operation of Law and Providing for Further Reconsideration," 180 FERC ¶ 62,095 (Aug. 29, 2022); and

3.    *Southwest Power Pool, Inc.*, Docket No. ER22-1712-000, "Order Addressing Arguments Raised on Rehearing and Granting Clarification, in Part," 181 FERC ¶ 61,053 (Oct. 20, 2022).

**D.    Related Cases**

Counsel is not aware of any related cases previously before this Court or any other court, or pending in this Court or in any other court.

Respectfully submitted,

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.

*Counsel for The Evergy Companies and GridLiance High Plains LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners Evergy Kansas Central, Inc., Evergy Metro, Inc., and Evergy Missouri West, Inc., and GridLiance High Plains LLC make the following disclosures:

Evergy Kansas Central, Inc., Evergy Metro, Inc., and Evergy Missouri West, Inc. (collectively, The Evergy Companies), are vertically integrated utilities that generate, transmit, and distribute electricity to customers in Kansas and Missouri. The Evergy Companies are transmission owners in the Southwest Power Pool, Inc. (SPP) and own transmission facilities that are under the operational control of SPP. The Evergy Companies are all wholly-owned subsidiaries of Evergy, Inc., a publicly-traded company (collectively, Evergy). At present, no publicly-traded company owns more than 10 percent of Evergy, Inc.

GridLiance High Plains LLC is a transmission-only company that was formed to partner with municipal electric utilities, electric cooperatives, and joint action agencies in the SPP region. GridLiance High Plains LLC is a transmission owner in SPP and owns transmission facilities that are under the functional control of SPP. GridLiance High Plains LLC is an indirect, wholly-owned subsidiary of GridLiance Holdco, LLC, which in turn is a direct, wholly-owned subsidiary of NextEra Energy Transmission, LLC. NextEra Energy Transmission, LLC is in turn a wholly-owned

subsidiary of NextEra Grid Holdings, LLC, which is a direct, wholly-owned subsidiary of NextEra Energy Capital Holdings, Inc.  NextEra Energy Capital Holdings, Inc. is a direct wholly-owned subsidiary of NextEra Energy, Inc. (NextEra).  NextEra is a publicly-held company with shares listed on the New York Stock Exchange.  No publicly-held company has a 10 percent or greater ownership interest in NextEra.

Respectfully submitted,

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.

*Counsel for The Evergy Companies and GridLiance High Plains LLC*

v

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................... iv

TABLE OF AUTHORITIES ................................................. viii

GLOSSARY OF ABBREVIATIONS .................................... xii

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT ...........................................4

STATUTES AND REGULATIONS ...........................................4

STATEMENT OF ISSUES .....................................................5

STATEMENT OF THE CASE .................................................5

    A.    Statutory and Regulatory Overview .........................................5

    B.    Regional and Local Transmission Planning in SPP ...........................9

        1.    The Evolution of SPP Planning Criteria ..................................12

        2.    2020 SPP Filing ........................................................14

    C.    Proceedings Below .............................................................16

SUMMARY OF THE ARGUMENT .....................................21

STANDING ......................................................................22

STANDARD OF REVIEW ...................................................23

ARGUMENT ....................................................................25

I.    FERC Violated Core Requirements Under FPA Section 205 ......................25

    A.    FERC Unlawfully Accepted Tariff Provisions that Will Systematically Exclude Zonally Beneficial Projects from Zonal and Regional Cost Allocation in Violation of the Cost Causation Principle ..............................................................25

        1.    FERC Irrationally Accepted a Broken "Transparency" Remedy to Solve a Non-Existent Cost Allocation Problem ..............................................................32

        2.    FERC Irrationally Inverted and Exacerbated Concerns About Zonal Planning Coordination By Disregarding Petitioners' Arguments, Endorsing Inconsistent Treatment Between Zones, and Failing to Distinguish Relevant Precedent ..................................................33

B.  FERC Unlawfully Shifted the Burden of Proof from SPP to Petitioners .......................................................................... 37

C.  FERC Unlawfully Imposed Significant New Planning Burdens on Facilitating Transmission Owners Without Compensation .......... 42

II.  FERC Failed to Engage in Reasoned Decisionmaking Under the APA ....... 45

A.  FERC Premised Its Decision on a Fundamental Misunderstanding of SPP's Proposal that FERC Declined to Correct ................................................................................... 45

B.  The 2022 SPP Orders Arbitrarily and Capriciously Allow SPP to Abdicate Its Planning Responsibilities and Fail to Justify Inconsistencies with the 2020 SPP Order ........................... 47

C.  FERC Ignored the 2022 SPP Proposal's Adverse Impacts on Reliability ................................................................... 51

III.  The FPA Does Not Require Petitioners to File New Petitions When FERC Issues Substantive Rehearing Orders ................................. 54

CONCLUSION ......................................................................... 57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

Attachment A: Statutory Addendum

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Administration*, 41 F.4th 586 (2022) .......................................23

*Alabama Electric Coop., Inc. v. FERC*, 684 F.2d 20 (D.C. Cir. 1982).................... 6

*Alabama Power Co. v. FERC*, 993 F.2d 1557 (D.C. Cir. 1993) ...........................37

*Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) ........................54

*Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289 (D.C. Cir. 2001) ..........................................................................................24

*\*Coalition of MISO Transmission Customers v. FERC*, 45 F.4th 1004 (D.C. Cir. 2022) ........................................................ 25-26, 30 n.8, 56

*Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028 (D.C. Cir. 2022) ................................................................................................ 6

*Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021) ........................................23

*Director, OWCP v. Greenwich Collieries*, 512 U.S. 267 (1994) ............... 37-38, 42

*\*Entergy Arkansas, LLC, v. FERC*, 40 F.4th 689 (D.C. Cir. 2022) ........................26

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...................................25

*FirstEnergy Service Co. v. FERC*, 758 F.3d 346 (D.C. Cir. 2014) ..............6, 39, 41

*Florida Gas Transmission Co. v. FERC*, 604 F.3d 363 (D.C. Cir. 2010) ................................................................................................24

*Florida Municipal Power Agency v. FERC*, 315 F.3d 362 (D.C. Cir. 2003) ................................................................................................25

*FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575 (1942) ........................................44

*In re NTE Connecticut, LLC*, 26 F.4th 980 (D.C. Cir. 2022) ..........................37, 44

*Authorities chiefly relied upon are marked with an asterisk.

viii

*Jersey Central Power & Light Co. v. FERC*, 810 F.2d 1168 (D.C. Cir. 1987) ...........................................................................21, 44

*Long Island Power Auth. v. FERC*, 27 F.4th 705 (D.C. Cir. 2022)...5, 6, 23, 30 n.8

*Lujan v. Defendres of Wildlife*, 504 U.S. 555 (1992) ..............................................23

*Motor Vehicle Mfrs. Assn v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983)....................................................................................23, 53

*Nebraska Public Power Distric v. FERC*, 957 F.3d 932 (8th Cir. 2020) ..................................................................................................9

*New England Generators Ass'n, Inc. v. FERC*, 881 F.3d 202 (D.C. Cir. 2018) .................................................................. 23-24, 37, 53

*Old Dominion Electric Coop. v. FERC*, 898 F.3d 1254 (D.C. Cir. 2018) ........................................... 3, 6, 8, 18, 21, 23, 25-26, 28-29, 30-31, 38, 40

*PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194 (D.C. Cir. 2005) .................................................................................44, 47

*PSEG Energy Resources & Trade LLC v. FERC*, 665 F.3d 203 (D.C. Cir. 2011) ...............................................................................50, 53, 55

*Public Service Electric & Gas Co. v. FERC*, 989 F.3d 10 (D.C. Cir. 2021) .................................................................................7, 8, 25

*Public Utility District No. 1 of Snohomish County v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) ...................................................... 6 n.2, 22-23

*Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55 (D.C. Cir. 2015) ........................................................................54

*South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) ...............................................................................7 n.4

*TransCanada Power Marketing Ltd. v. FERC*, 811 F.3d 1 (D.C. Cir. 2015) ...............................................................................24, 44

*Trunkline Gas Co. v. FERC*, 880 F.2d 546 (D.C. Cir. 1989) ...........................44, 45

*West Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014) ..............24, 50

*Authorities chiefly relied upon are marked with an asterisk.

*Xcel Energy Serices Inc. v. FERC*, 815 F.3d 947 (D.C. Cir. 2016)...........................9

**Statutes**

5 U.S.C. § 556.................................................................................................37

5 U.S.C. § 706.................................................................................................23

Federal Power Act (FPA), 16 U.S.C. §§ 791-825r

    FPA section 205, 16 U.S.C. § 824d..................... 5, 14, 18, 25, 30, 34, 37, 39

    FPA section 206, 16 U.S.C. § 824e .......................................................39, 41

    FPA section 313, 16 U.S.C. § 825*l*.......................................................4, 54, 56

**Agency Decisions**

*Building for the Future Through Electric Regional Transmission*
    *Planning & Cost Allocation & Generator Interconnection*, 179
    FERC ¶ 61,028 (2022) .................................................... 8, 9, 20, 51-52

*Policy Statement on Matters Related to Bulk Power System*
    *Reliability*, 107 FERC ¶ 61,052, at P 13 (2004)...........................53 n.9

*Preventing Undue Discrimination & Preference in Transmission*
    *Serv.*, Order No. 890, 118 FERC ¶ 61,119, at P 435, *order on*
    *reh'g*, Order No. 890-A, 121 FERC ¶ 61,297 (2007), *order on*
    *reh'g*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on*
    *reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on*
    *clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009) ........................7, 13

*Public Service Electric & Gas Co.*, 179 FERC ¶ 61,001 (2022)...................... 36-37

*Regional Transmission Organizations*, Order No. 2000, 89 FERC
    ¶ 61,285, *order on reh'g*, Order No. 2000-A, 90 FERC ¶ 61,201,
    *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*,
    272 F.3d 607 (D.C. Cir. 2001)...................................... 6, 7, 47-48, 50

*Southwest Power Pool, Inc.*, 172 FERC ¶ 61,202 (2020) .......................... 14-16, 47

*Southwest Power Pool, Inc.*, 179 FERC ¶ 61,229 (2022)
    ........................................................4, 18-20, 29, 33-34, 36, 38-39, 43, 45-47, 49

*Authorities chiefly relied upon are marked with an asterisk.

x

*Southwest Power Pool, Inc.*, 180 FERC ¶ 62,095 (2022) ...................................4, 55

*Southwest Power Pool, Inc.*, 181 FERC ¶ 61,053 (2022)
................................................4, 7, 13, 19-20, 26, 29-35, 39-43, 46, 48-50, 52

*Southwest Power Pool, Inc.*, Op. No. 579, 180 FERC ¶ 61,192 (2022).................37

*Transmission Planning & Cost Allocation by Transmission Owning &
Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051
(2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132,
*order on reh'g & clarification*, Order No. 1000-B, 141 FERC
¶ 61,044 (2012) ...............................................................................7-8, 47-48, 50

**Tariff Provisions**

SPP Tariff, Attach. H, § I, Tbl. 1 ..................................................................... 9-11

SPP Tariff, Attach. O, § II.5 ................................................................................48

SPP Tariff Sch. 7.....................................................................................................9

**Other**

FERC, *Recent Changes in Commission Rehearing Practice* (Sept. 17,
2020) ...........................................................................................................55 n.10

Southwest Power Pool, *Fast Facts* ........................................................................9

*Southwest Power Pool, Inc.*, Submission of Tariff Revisions to
Establish Zonal Planning Criteria, Docket No. ER20-2334-000
(July 7, 2020) ......................................................................................................14

*Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| 2020 SPP Proposal | *Sw. Power Pool, Inc.*, Submission of Tariff Revisions to Establish Zonal Planning Criteria, Docket No. ER20-2334-000 (July 7, 2020) |
| 2022 SPP Orders | Collectively, *Sw. Power Pool, Inc.*, 179 FERC ¶ 61,229 (2022); *Sw. Power Pool, Inc.*, 180 FERC ¶ 62,095 (2022); and *Sw. Power Pool, Inc.*, 181 FERC ¶ 61,053 (2022) |
| 2022 SPP Proposal | *Sw. Power Pool, Inc.*, Submission of Tariff Revisions to Establish Zonal Planning Criteria, Docket No. ER22-1719-000 (Apr. 29, 2022) |
| AEP | American Electric Power Corporation |
| APA | Administrative Procedure Act |
| Commission | Federal Energy Regulatory Commission |
| CTOA | PJM Coordinated Transmission Operating Agreement |
| Evergy | Evergy Inc. and its operating subsidiaries, The Evergy Companies |
| Evergy Protest | *Sw. Power Pool, Inc.*, Protest of the Indicated SPP Transmission Owners, Docket No. ER22-1719-000 (May 20, 2022) |
| Evergy Rehearing Request | *Sw. Power Pool, Inc.*, Request for Rehearing, Alternative Requests for Clarification, and Request for Expedited Action of the Indicated SPP Transmission Owners, Docket No. ER22-1719-000 (July 22, 2022) |
| Facilitating Transmission Owner | Defined in the SPP Tariff, § 1.1, in part as: "The Facilitating Transmission Owner is |

responsible for the Zonal Planning Criteria responsibilities as described in Attachment O of this Tariff. By April 2nd, the Network Customer with the largest total Network Load in the Zone, computed in accordance with Sections 34.4 and 34.5 of the Tariff on an average calendar year basis for the prior calendar year, shall designate a Transmission Owner with a Zonal Annual Transmission Revenue Requirement for facilities in the Zone as the Facilitating Transmission Owner for the Zone each year."

| | |
|---|---|
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| GridLiance | GridLiance High Plains LLC |
| GridLiance Protest | *Sw. Power Pool, Inc.*, Protest of GridLiance High Plains LLC, Docket No. ER22-1719-000 (May 20, 2022) |
| GridLiance Rehearing Request | *Sw. Power Pool, Inc.*, Request for Rehearing or, in the Alternative, Clarification of GridLiance High Plains LLC, Docket No. ER22-1719-000 (July 28, 2022) |
| ISO | Independent System Operator |
| ITP | Integrated Transmission Planning process |
| June 28 Order | *Sw. Power Pool, Inc.*, 179 FERC ¶ 61,229 (2022) |
| Long-Term Service | Defined in the SPP Tariff, § 1.1, as: "Long-Term Firm Point-To-Point Transmission Service or Network Integration Transmission Service of one year or longer." |

| | |
|---|---|
| Modification Order | *Sw. Power Pool, Inc.*, 181 FERC ¶ 61,053 (2022) |
| NERC | North American Electric Reliability Corporation |
| Network Customer | Defined in the SPP Tariff, § 1.1, as: "An entity receiving transmission service pursuant to the terms of the Transmission Provider's Network Integration Transmission Service under Part III of the Tariff." |
| Network Load | Defined in the SPP Tariff, § 1.1, in part as: "The load that a Network Customer designates for Network Integration Transmission Service under Part III of the Tariff." |
| NextEra | NextEra Energy, Inc. |
| OG&E | Oklahoma Gas & Electric Company |
| OG&E Protest | *Sw. Power Pool, Inc.*, Protest of Oklahoma Gas and Electric Company, Docket No. ER22-1719-000 (May 20, 2022) |
| OG&E Rehearing Request | *Sw. Power Pool, Inc.*, Request for Rehearing of Oklahoma Gas and Electric Company, Docket No. ER22-1719-000 (July 27, 2022) |
| PJM | PJM Interconnection, L.L.C. |
| Planning NOPR | *Building for the Future Through Electric Regional Transmission Planning & Cost Allocation & Generator Interconnection*, 179 FERC ¶ 61,028 (2022) |
| *PSEG* | *Public Service Electric & Gas Co.*, 179 FERC ¶ 61,001 (2022) |
| RTO | Regional Transmission Organization |

| | |
|---|---|
| SPP | Southwest Power Pool, Inc. |
| SPP Criteria | Defined in the SPP Tariff, § 1.1, as: The SPP Planning Criteria and SPP Operating Criteria collectively, as approved by the Board of Directors in accordance with the SPP Bylaws, and posted on the SPP website. |
| SPP Planning Criteria | Criteria employed by SPP for regional planning purposes |
| Tariff | Open Access Transmission Tariff |
| The Evergy Companies | Evergy Kansas Central, Inc., Evergy Metro, Inc., and Evergy Missouri West, Inc. |
| Transmission Customer | Defined in the SPP Tariff, § 1.1, in part as: "Any Eligible Customer (or its Designated Agent) that (i) executes a Service Agreement, or (ii) requests in writing that the Transmission Provider file with the Commission, a proposed unexecuted Service Agreement to receive transmission service under Part II of the Tariff." |
| Transmission Owner | Defined in the SPP Tariff, § 1.1, in part as: "Each Member of SPP that has executed an SPP Membership Agreement as a Transmission Owner and therefore has the obligation to construct, own, operate, and maintain transmission facilities as directed by the Transmission Provider and: (i) whose Tariff facilities (in whole or in part) make up the Transmission System; or (ii) who has accepted a Notification to Construct but does not yet own transmission facilities under SPP's functional control." |
| Zonal Annual Transmission Revenue Requirement | Defined in the SPP Tariff, § 1.1, as: "The revenue requirements for facilities in each Zone and the Accredited Revenue |

|  | Requirement(s), if any, that are allocated to the Zone in accordance with Attachment J to this Tariff as set forth in Attachment H, Table 1, Column (3)." |
|---|---|
| Zonal Planning Criteria | Defined in the SPP Tariff, § 1.1, as: "In each Zone, the set of measuring systems and performance standards that is used for assessing the actual or projected ability of the Transmission System to deliver power to load reliably. Zonal Planning Criteria for Zone 10 shall be subject to Attachment AD of the Tariff." |
| Zonal Reliability Upgrades | Defined in the SPP Tariff, § 1.1, as: "Those upgrades included in and constructed pursuant to the SPP Transmission Expansion Plan in order to ensure the reliability of the Transmission System identified because of application of Zonal Planning Criteria. Zonal Planning Criteria for Zone 10 shall be subject to Attachment AD of the Tariff." |
| Zone | Defined in the SPP Tariff, § 1.1, as: "The geographic area of the facilities of a Transmission Owner or a specific combination of Transmission Owners as specified in Schedules 7, 8, and 9." |

## INTRODUCTION

This case is about the effect transmission planning procedures have on transmission cost allocation among utilities within the Southwest Power Pool (SPP), a Regional Transmission Organization (RTO) regulated by the Federal Energy Regulatory Commission (FERC). FERC's orders below accepted changes to SPP's planning procedures that will systematically permit certain utilities to escape cost responsibility for transmission projects that benefit them. That outcome violates the Federal Power Act (FPA) and this Court's precedents.

FERC regulations and SPP's Open Access Transmission Tariff (OATT or Tariff) require SPP to administer a regional transmission plan that incorporates mandatory reliability standards set by the North American Reliability Corporation (NERC), SPP Criteria,[1] and Transmission Owner-specific local planning criteria. Historically, SPP identified Zonal Reliability Upgrades during its regional planning process by using voltage limits determined through each Transmission Owner's local planning process. As required by cost causation principles, utilities within each SPP transmission pricing Zone have shared the cost of Zonal Reliability Upgrades by allocating costs among utilities in proportion to their respective electric loads, reflecting the benefit that each utility receives.

---

[1] Capitalized terms not otherwise defined in this brief have the meaning set forth in the SPP Tariff.

In the proceeding below, SPP modified its Tariff to create a system for establishing Zonal Planning Criteria—a new feature that displaced SPP's previous reliance on individual Transmission Owners' local planning criteria to identify both Zonal Reliability Upgrades and regionally-beneficial Base Plan Upgrades. Specifically, SPP directed the utility with the largest load in each Zone to designate a Facilitating Transmission Owner to administer a stakeholder process to adopt Zonal Planning Criteria through a two-step voting process. Step one is a load-weighted vote requiring approval by the largest load in the Zone plus one-half of the remainder of the load in the Zone. Step two requires majority approval from all Transmission Owners and Transmission Customers, with mixed vertically-integrated or affiliated entities casting only one vote. Going forward, SPP's Tariff revisions explicitly deny zonal cost allocation for projects built pursuant to local planning criteria outside of the new zonal planning process without regard for zonal benefits, even when such projects are identified pursuant to local planning process approved by FERC itself. SPP's new rules also limit access to regional cost allocation because SPP substituted Zonal Planning Criteria for SPP's previous reliance on local planning criteria to identify regionally-beneficial projects.

SPP intended to eliminate the "potential for a Transmission Owner to establish local planning criteria that would produce upgrades solely, or disproportionately, benefitting a portion of the load in the Zone at the expense of all load in the Zone."

JA0010; JA425.  The effect, however, was to make the adoption of Zonal Planning

Criteria impossible in several Zones, including those in which Petitioners operate,

because the voting rules allow any single utility—regardless of its size—to veto the

adoption of Zonal Planning Criteria and thereby force all costs on the constructing

Transmission Owner regardless of any benefit the vetoing utility might receive.

That is not a lawful ratemaking regime.  To be just and reasonable under the

FPA, transmission cost allocation must conform to the cost causation principle,

which "ensures burden is matched with benefit, so that FERC generally may not

single out a party for the full cost of a project, or even most of it, when the benefits

of the project are diffuse."  *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254,

1255 (D.C. Cir. 2018) (*ODEC*).  Therefore, it is not just and reasonable for FERC to

categorically "prohibit cost sharing for any project included in [a] Regional Plan

only to satisfy individual utilities' planning criteria." *Id.* at 1257.  Nevertheless, that

is precisely what FERC's orders below do.  FERC lost its way because it conflated

voting procedures with cost allocation, forgetting this Court's guidance that "the

cost-causation principle focuses on project benefits, not on how particular planning

criteria were developed." *Id.* at 1262.

The orders below also violated the FPA by impermissibly shifting the burden

of proof from the rate proponent to Petitioners and by imposing significant planning

mandates on Facilitating Transmission Owners without any form of compensation.

And all of these statutory violations are compounded by several failures of reasoned decisionmaking under the Administrative Procedure Act (APA). For all of these reasons, FERC's orders must be vacated.

## JURISDICTIONAL STATEMENT

FERC issued its initial order on June 28, 2022. *Sw. Power Pool, Inc.*, 179 FERC ¶ 61,229 (2022) (June 28 Order), JA242. Evergy and GridLiance timely sought rehearing on July 22 and July 27, 2022, respectively. JA266; JA327. On August 25, 2022, Evergy timely petitioned this Court for review. JA372. Four days later, FERC's secretary issued a Notice advising that all requests for rehearing were deemed denied under FPA section 313(a), 16 U.S.C. § 825*l*(a). *Sw. Power Pool, Inc.*, 180 FERC ¶ 62,095 (2022), JA386. GridLiance timely petitioned for review on September 27, 2022. JA387. The Court consolidated the petitions the next day.

After FERC issued an October 20, 2022 substantive rehearing order, *Sw. Power Pool, Inc.*, 181 FERC ¶ 61,053 (2022) (Modification Order), JA390, Evergy and GridLiance moved to amend their petitions on October 21, 2022. On November 14, 2022, GridLiance filed an additional petition for review, JA440, that was consolidated with the earlier petitions on November 16, 2022. This Court has jurisdiction under FPA section 313(b), 16 U.S.C. § 825*l*(b).

## STATUTES AND REGULATIONS

Pertinent statutes are appended as Attachment A.

## STATEMENT OF ISSUES

1.      Whether FERC violated the Federal Power Act (FPA) by accepting Tariff revisions that render regionally and zonally beneficial transmission projects ineligible for regional or zonal cost allocation, by shifting the burden of proof to Petitioners in the proceedings below, and by imposing planning burdens on Facilitating Transmission Owners without compensation.

2.      Whether the Commission violated the Administrative Procedure Act (APA) by basing its decision on a fundamental misunderstanding of the 2022 SPP Proposal, allowing SPP to abdicate its planning responsibilities, failing to justify its departure from prior precedent, and ignoring the 2022 SPP Proposal's adverse impacts to the reliability of the SPP transmission system.

3.      As directed by the Court, whether the FPA requires new petitions for review, rather than amended petitions for review, to obtain review of orders issued after the original petitions for review were filed.

## STATEMENT OF THE CASE

### A. Statutory and Regulatory Overview

FPA section 205 requires FERC to ensure public utilities charge "'just and reasonable' rates for the transmission of electricity in interstate commerce." *Long Island Power Auth. v. FERC*, 27 F.4th 705, 709 (D.C. Cir. 2022) (*LIPA*) (quoting 16 U.S.C. § 824d).  This statutory obligation has long been held "to incorporate a 'cost

causation principle'—the rates charged for electricity should reflect the costs of providing it." *ODEC*, 898 F.3d at 1255 (citing *Ala. Elec. Coop., Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982)); *accord, e.g.*, *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1049-50 (D.C. Cir. 2022); *LIPA*, 27 F.4th at 709.

The cost causation principle "adds flesh to the bare statutory bones of the just-and-reasonable rate requirement" and "requires comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party." *ODEC*, 898 F.3d at 1255-56 (cleaned up).   This cost/benefit comparison—also known as the "beneficiary pays" principle—"ensures burden is matched with benefit, so that FERC generally may not single out a party for the full cost of a project, or even most of it, when the benefits of the project are diffuse." *Id.* at 1255.  It is well established that "a 'beneficiary pays' approach is a just and reasonable basis for allocating the costs of regional transmission projects." *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 354 (D.C. Cir. 2014).

To implement these principles into regional transmission planning, FERC required in Order No. 2000[2] that each Regional Transmission Organization (RTO) "must have ultimate responsibility for both transmission planning and expansion within its region that will enable it to provide efficient, reliable and non-

---

[2] *Reg'l Transmission Orgs.*, Order No. 2000, 89 FERC ¶ 61,285, *order on reh'g*, Order No. 2000-A, 90 FERC ¶ 61,201, *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).

discriminatory service and coordinate such efforts with the appropriate state authorities." Order No. 2000 at 31,163. FERC built on these principles in Order No. 890,[3] which "required that transmission providers, such as SPP, participate in a coordinated, open, and transparent planning process on both a local and regional level." Modification Order at P 4, JA392 (quoting Order No. 890, at P 435.

In 2011 FERC promulgated Order No. 1000[4] "to foster the efficient development of the transmission grid." *Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 14 (D.C. Cir. 2021). Among its other obligations, "Order No. 1000 requires utilities to participate in regional transmission planning and to include in their tariffs a formula 'for allocating the costs of new transmission facilities selected in the regional transmission plan.'" *Id.* (quoting Order No. 1000 at P 448). Pursuant to Order No. 1000, a utility's cost-allocation methodology must satisfy six criteria, "the first of which embodies the cost-causation principle by requiring that costs be 'allocated in a way that is roughly commensurate with benefits.'" *Id.* (quoting Order

---

[3] *Preventing Undue Discrimination & Preference in Transmission Serv.*, Order No. 890, 118 FERC ¶ 61,119, at P 435, *order on reh'g*, Order No. 890-A, 121 FERC ¶ 61,297 (2007), *order on reh'g*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

[4] *Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000,136 FERC ¶ 61,051 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g & clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).

No. 1000 at P 622). Projects that provide regional benefits therefore may not be "arbitrarily excluded from cost-sharing—a necessary corollary to ensuring that the costs of such projects are allocated commensurate with their benefits." *ODEC*, 898 F.3d at 1263.

Most recently, FERC reiterated the goal of adopting "more efficient and cost-effective" regional transmission solutions rather than less-efficient local solutions in its Notice of Proposed Rulemaking (Planning NOPR) issued April 21, 2022.[5] The Planning NOPR expressed concern that "public utility transmission providers developing regional transmission plans may lack the information necessary to identify the benefits regional transmission facilities may provide in deferring or eliminating the need for in-kind replacements." Planning NOPR at P 399. As FERC explained, the "lack of coordination between regional transmission planning processes and in-kind replacement of existing transmission facilities to identify whether these replacement transmission facilities could be modified to more efficiently or cost-effectively address transmission needs identified through Long-Term Regional Transmission Planning." *Id.* FERC also expressed concern that utilities are not "evaluating whether those replacement transmission facilities could

---

[5] *Building for the Future Through Electric Regional Transmission Planning & Cost Allocation & Generator Interconnection*, 179 FERC ¶ 61,028 (2022) (Planning NOPR).

be modified (*i.e.*, right sized) to more efficiently or cost-effectively address regional transmission needs." *Id.* To address these issues, the Planning NOPR proposes a series of reforms that would mandate that local transmission needs be considered as part of the regional transmission planning process. *Id.* PP 400-415.

## B. Regional and Local Transmission Planning in SPP

SPP is an RTO responsible for "administer[ing] the provision of open access transmission service on a regional basis across the facilities of its transmission owning members." *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 950 (D.C. Cir. 2016) (citation omitted). SPP has members in fourteen states and is divided into nineteen regional transmission Zones, one of which is currently "reserved for future use." SPP Tariff, Sch. 7; *see* Southwest Power Pool, *Fast Facts*, https://www.spp. org/about-us/fast-facts/. Customers in each Zone are charged "rates based on the cost of transmission facilities in that [Z]one." *Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 934 (8th Cir. 2020). Unlike other RTOs and independent system operators (ISOs), ten of SPP's transmission Zones contain multiple Transmission Owners. *See* SPP Tariff, Attach. H, § I, Tbl. 1.

The figure below roughly illustrates SPP's current pricing Zones, each identified by the original name of its dominant transmission-owning utility, some of which have changed.

9



Holland Aff. ¶ 6, JA107 (modified to add Zone numbers and correct Zone 6/9 boundary). These Zones vary significantly in terms of geographic area (single municipalities to multiple states), electric load density (rural to urban industrial), the number of transmission-owning utilities they include (one to twenty), and utility business models (cooperatives, municipal and other public power entities, vertically-integrated utilities, and independent transmission companies). *See id.* ¶¶ 7-8.

Petitioner Evergy's vertically-integrated operating companies in the greater Kansas City metropolitan region and eastern Kansas generate power and serve electric load in Zones 6 (Evergy Metro), 9 (Evergy Mo. West), and 14 (Evergy Kansas Central). *See* SPP Tariff, Attach. H, § I, Tbl. 1. Evergy is the dominant

transmission-owning utility in each Zones it serves. It shares Zone 6 with the City of Independence, MO; shares Zone 9 with Transource Missouri, LLC (jointly-owned by American Electric Power (AEP); and shares Zone 14 with Prairie Wind Transmission, LLC (also jointly-owned by AEP), Kansas Power Pool (a municipal energy agency), and co-Petitioner GridLiance. *Id.*

GridLiance is a transmission-only utility formed to partner with municipally-owned electric utilities, joint action agencies, and electric cooperatives in SPP. GridLiance operates in Zones 11 and 14. *Id*. (listing GridLiance as South Central MCN LLC). The dominant utilities in those Zones are Southwestern Public Service Company (Zone 11), and co-Petitioner Evergy (Zone 14).

A boundary map does not indicate the electrical relationships between SPP's members, which is important here. The next figure demonstrates the electrical relationship between Evergy's transmission facilities and other facilities embedded within Evergy's transmission network, including the City of Independence (lime), Transource Missouri, LLC (red), and Prairie Wind Transmission, LLC (magenta).

## 1. The Evolution of SPP Planning Criteria

SPP's Integrated Transmission Planning (ITP) process serves as SPP's primary mechanism for performing regional planning. Holland Aff. ¶ 4, JA107. Under its regional planning process, SPP allocates the cost of transmission facilities based on SPP's 18 transmission pricing Zones. *Id.* ¶ 10, JA109. Specifically, SPP allocates the following projects exclusively to the local pricing Zones: (1) legacy projects; (2) projects built outside the SPP regional planning process pursuant to individual Transmission Owners' local planning standards; and (3) projects with voltages of less than 100 kV. *Id.* For projects with voltages between 100 and 300

kV, one-third is allocated to the entire SPP region and two-thirds are allocated to the relevant Zone. *Id.*

Historically, SPP has used its regional planning process to identify Zonal Reliability Upgrades based on each Transmission Owner's local planning criteria. *Id.* ¶ 14, JA110; *see also* JA038-40 (amending prior Tariff). "SPP first developed this process for identifying Zonal Reliability Upgrades in connection with its compliance with Order No. 890." Modification Order at P 4, JA392 (citing *Sw. Power Pool, Inc.*, 127 FERC ¶ 61,171, at PP 67-72 (2009)). SPP then allocated the costs of Zonal Reliability Upgrades to customers on a zonal basis. *Id.* Since the inception of transmission planning in SPP, Evergy has relied on the SPP regional planning process to implement Evergy's local planning criteria to develop reliability projects and, importantly, to allocate the costs of those projects to those who benefit from them. GridLiance, however, has an independent local planning process that FERC approved separately from the SPP planning process. GridLiance Protest at 31, JA103; GridLiance Rehearing Request at 11-12, JA337-38.

Thus, under the preexisting Tariff, if a utility identified local reliability projects through its local planning criteria, those costs could be allocated to the utility's Zone because adherence to local planning criteria confers benefits to the Zone. However, the only component of local planning criteria SPP studied were voltage criteria more stringent than SPP's own voltage criteria. Holland Aff. ¶¶ 11-

12, JA109.  Other criteria that drive an individual Transmission Owner's local planning criteria were—and are still—not considered.  *Id.* ¶¶ 13, 17, JA110-11.  However, because "SPP's focus is on regional planning," SPP did not "utilize any specific local models or local-specific scenarios that are needed to ensure local reliability." *Id.* ¶ 19, JA111.

### 2.  2020 SPP Filing

In 2020, SPP proposed revisions to its Tariff under FPA section 205 to establish uniform local transmission planning criteria, or "Zonal Planning Criteria" within each Zone.  *See Sw. Power Pool, Inc.*, Submission of Tariff Revisions to Establish Zonal Planning Criteria, Docket No. ER20-2334-000 (July 7, 2020) (2020 SPP Proposal).  Specifically, SPP proposed that the Network Customer with the largest total Network Load in each Zone designate a Transmission Owner as the "Facilitating Transmission Owner" responsible for developing a single set of Zonal Planning Criteria for the Zone by April 1 of each year.  FERC identified several fatal flaws with the 2020 SPP Proposal and rejected it as unjust and unreasonable.  *Sw. Power Pool, Inc.*, 172 FERC ¶ 61,202 (2020) (2020 SPP Order).

First, under the 2020 SPP Proposal, the Network Customer with the largest total Network Load in its Zone would have had sole authority to designate a Facilitating Transmission Owner, which, as FERC noted, "could be the Network Customer itself … or a transmission-owning affiliate." *Id.* P 40.  And because it

14

would have had the unilateral authority to establish Zonal Planning Criteria, the Facilitating Transmission Owner could have chosen to select Zonal Planning Criteria to address its own local reliability needs and allocate the cost of any resulting Zonal Reliability Upgrades to all customers in the Zone. *Id.*

Second, FERC found the 2020 SPP Proposal unduly discriminatory against Transmission Customers in the Zone that either did not serve the largest share of load or that were not the Facilitating Transmission Owner. *Id.* P 41. Except for allowing such customers' attendance at "open meeting(s)," the 2020 SPP Proposal provided no formal process rights to influence the Facilitating Transmission Owner. *Id.* Moreover, SPP, "the independent entity administering the regional transmission planning process where the Zonal Planning Criteria would be used, propose[d] to take no rule in ensuring that input from other … stakeholders in the zone [were] considered during the development of the Zonal Planning Criteria." *Id.* The Facilitating Transmission Owner would have sole authority to establish Zonal Criteria that SPP would "accept without revision." *Id.*; *see also id.* n.68 ("SPP's proposed Tariff language places ultimate responsibility for the development of Zonal Planning Criteria on the Facilitating Transmission Owner.").

Lastly, SPP's proposed Tariff language was ambiguous and "could be read as requiring Transmission Owners to use the Zonal Planning Criteria for *all* purposes, which would infringe on the ability of individual Transmission Owners to use their

15

separate local transmission planning processes outside of the regional transmission planning process." *Id.* (emphasis added).

### C. Proceedings Below

On April 29, 2022, SPP again proposed Tariff revisions to establish Zonal Planning Criteria for its transmission planning process (2022 SPP Proposal). JA001. As with the 2020 SPP Proposal, SPP proposed that the largest Network Customer in each Zone appoint a Facilitating Transmission Owner responsible for annually developing a single set of Zonal Planning Criteria. 2022 SPP Proposal at 11, JA011. Each Zone's Facilitating Transmission Owner will hold "open meeting(s)" each year to discuss the Zonal Planning Criteria. *Id.* at 12, JA012. Only Transmission Owners and those Transmission Customers receiving Long-Term Service to serve load within the Zone will participate in such meetings, although "any entity desiring to discuss the development and subsequent modification of Zonal Planning Criteria" could also attend. *Id.*

Under the 2022 SPP Proposal, each Transmission Owner and Transmission Customer receiving Long-Term Service to serve load within the Zone can submit proposed Zonal Planning Criteria to the Facilitating Transmission Owner by May 1 of each year. *Id.* Next, the Facilitating Transmission Owner posts all such submissions it receives along with draft Zonal Planning Criteria for comments from any interested parties within the Zone by June 1. *Id.* After receiving input, the

16

Facilitating Transmission Owner posts final draft Zonal Planning Criteria, considers any additional comments, and schedules an "open meeting" that—for each Zone other than Zone 19—utilizes a two-step voting system to either approve or reject the proposed Zonal Planning Criteria. *Id.* at 12-13, JA012-13.

Step one of SPP's proposed two-step voting mechanism incorporates a "load-weigh[t]ed vote of all Transmission Customers receiving Long-Term Service to serve load in that Zone based on the prior calendar year's 12 month peak load in that Zone." *Id.* at 13, JA013. Specifically, this stage requires "a percentage of vote to approve greater than or equal to the largest load in the Zone plus one-half of the remainder of the load in the Zone." *Id.* Step two requires a simple majority approval from all Transmission Owners and Transmission Customers receiving Long-Term Service to serve load within the Zone. *Id.* Entities that are both Transmission Owners and Transmission Customers receive only one vote at this stage, as do affiliated entities. *Id.*

The 2022 SPP Proposal excludes Zone 19 from the two-step voting process, however, because it "has already developed a stringent, pre-existing consensus voting process" that utilizes a single vote requiring a 75% consensus among Transmission Owners and Transmission Customers that receive Long-Term Service to serve load within the Zone. *Id.* at 15, JA015. Thus, Zone 19 takes "a first vote component by Transmission Customers taking Long-Term Service to serve load in

Zone 19 based upon weighted load in the Zone, and a second vote component by Transmission Owners in the Zone based upon gross Zonal Annual Transmission Revenue Requirement." *Id.* Zone 19 must adhere to the remainder of the 2022 SPP Proposal. *Id.*

For each Zone, the Facilitating Transmission Owner must send a report with minutes from all "Zonal Planning Criteria meeting(s)" to SPP by March 1 and the approved Zonal Planning Criteria by April 1 of each year. *Id.* at 13-14, JA013-14. If the Zone fails to establish such Zonal Planning Criteria, SPP will use the most recently approved Zonal Planning Criteria it received or, if no Zonal Planning Criteria has been previously approved, then SPP will use its own Planning Criteria. *Id.* at 14, JA014.

Petitioners, along with Intervenor Oklahoma Gas & Electric Company (OG&E), protested the Tariff amendments as unjust, unreasonable, and unduly discriminatory and preferential under FPA section 205. FERC rejected Petitioners' objections and accepted SPP's Tariff revisions in the June 28 Order. JA242.

On rehearing, Petitioners argued that the June 28 Order was unlawful because it: (1) will cause inequitable cost allocation among Transmission Owners, in violation of the cost causation principle announced by this Court in *ODEC*; (2) accepted an unworkable and inequitable two-step voting scheme that also conflicted with precedent; (3) impermissibly shifted the burden of proof from SPP

18

to Petitioners; and (4) imposed unduly burdensome administrative burdens Transmission Owners without compensation.  *See* Indicated SPP Transmission Owners Rehearing Request (hereinafter, Evergy Rehearing Request) at 1-4, JA269-72; GridLiance Rehearing Request at 1-4, JA327-30.

Petitioners further argued the June 28 Order was arbitrary and capricious under the APA because it was based on erroneous factual assumptions, contravened prior FERC precedent, allowed SPP to abdicate its transmission planning duties as an RTO, and would undermine reliability in SPP.  Evergy Rehearing Request at 1-4, JA269-72; GridLiance Rehearing Request at 1-9, JA327-35.

On August 29, 2022, FERC denied all rehearing requests by operation of law. JA386.  Later, on October 20, 2022, after FERC's initial statutory period had lapsed, FERC issued a substantive order denying rehearing.  *See* Modification Order at P 2, JA391.  FERC found SPP's proposed two-step voting process just and reasonable because it does not allow any single entity to "force a particular set of Zonal Planning Criteria to be adopted without consensus."  *Id.* P 22, JA404.  FERC conceded that "a small group of transmission customers or even a single transmission customer" could "vote against the proposed Zonal Planning Criteria in step one and thus prevent their adoption," but found that did not matter because larger customers and Transmission Owners could do the same thing.  *Id.*  The Modification Order concluded that SPP's Tariff revisions neither violate the cost causation principle nor

19

threaten reliability because SPP's existing regional planning criteria will apply to any Zone that fails to adopt Zonal Planning Criteria. *Id.* PP 42, 44, JA417-18, JA420. FERC also rejected Petitioners' argument that its acceptance of SPP's voting structure represented a departure from FERC precedent. *Id.* PP 63-64, JA432-34.

FERC conceded that the Tariff revisions would give SPP "a more limited role in the Zonal Planning Criteria Development Process," but excused that "more limited role" because its Tariff revisions include "specific protections against undue discrimination and undue preference." *Id.* P 63, JA432-33. FERC also found the "potential burdens" on each Zone's Facilitating Transmission Owner from the SPP Proposal "reasonable in light of the importance of ensuring participation and transparency in the transmission planning process." *Id.* P 71, JA438.

FERC also did not agree that the June 28 Order unlawfully shifted the burden to Petitioners. *Id.* P 50, JA424. Although FERC rejected Petitioners' arguments on the ground that "no evidence has been presented" that all zonal customers would benefit from any particular zonal project, FERC claimed on rehearing that it "did not shift the burden to protesters to make any showing, but rather referred to the evidence in the record as a whole." *Id.* FERC rejected Petitioners' argument that it should have rejected SPP's proposed Tariff revisions in light of the pending Planning NOPR. *Id.* P 72, JA438.

These consolidated petitions for review followed.

## SUMMARY OF THE ARGUMENT

This Court's precedents do not permit FERC to categorically "prohibit cost sharing for any project included in [a] Regional Plan only to satisfy individual utilities' planning criteria." *ODEC*, 898 F.3d at 1257. Nevertheless, that is precisely what the 2022 SPP Orders will do. The 2022 SPP Orders will systematically prevent transmission projects that benefit multiple entities in a Zone from being eligible for cost sharing. That is because the 2022 SPP Proposal relies on a convoluted, two-step voting mechanism that requires near unanimity within each Zone to approve Zonal Planning Criteria and directly assigns the costs of local transmission projects identified outside that Zonal Planning Criteria process. This will ensure gridlock and encourage free riding as certain entities—whether Transmission Owners or Transmission Customers—exercise newly-gifted veto rights to reap the benefits of new transmission projects without helping to pay for them.

Worse, FERC summarily cast aside Petitioners' concerns with SPP's Tariff amendments and instead shifted the burden of proof from SPP to Petitioners, a blatant violation of both the FPA and APA. FERC also accepted SPP's proposal to impose burdensome new planning responsibilities on Facilitating Transmission Owners without providing compensation, contravening not only the FPA's requirement that rates be just and reasonable but also the Fifth Amendment. *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1175 (D.C. Cir. 1987).

These statutory and constitutional violations, while serious in their own right, were not FERC's only missteps.    FERC also contravened basic reasoned decisionmaking requirements under the APA:  FERC based its decision on a patently false factual premise it refused to correct; allowed SPP to abdicate its planning responsibilities as an RTO contrary to FERC regulations; departed without justification from its prior precedent; and deliberately ignored the adverse impacts the 2022 SPP Proposal will have on the reliability of the SPP transmission system. These failures were arbitrary and capricious and require vacatur in their own right.

Lastly, nothing in the FPA requires Petitioners to file new petitions for review to obtain review of orders issued after their original petitions for review were filed. The amendment of existing petitions to include orders issued after FERC's statutory rehearing deadline is sufficient.  New petitions add significant and unnecessary burdens for both the parties and the Court without producing any benefits.  This Court wisely ceased FERC's longstanding practice of issuing tolling orders as a means of delaying judicial review and should now clarify that parties may amend their petitions to obtain review of orders FERC issues after petitions have been filed.

## STANDING

Petitioners have standing.  Petitioners have "demonstrate[d] an actual or imminent injury that is fairly traceable to the challenged agency action and that will likely be redressed by a favorable decision." *Pub. Util. Dist. No. 1 of Snohomish*

22

*Cnty. v. FERC*, 272 F.3d 607, 613 (D.C. Cir. 2001) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

The orders below "directly regulate" Petitioners' conduct as SPP Transmission Owners. *E.g.*, *Corbett v. TSA*, 19 F.4th 478, 483 (D.C. Cir. 2021); *Advocates for Highway & Auto Safety v. Fed Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (2022). The orders below injure Petitioners by eliminating their previous access to zonal cost allocation for regionally beneficial projects, undermining reliability, and imposing administrative mandates without compensation. *See infra* at 25-37, 42-45, 51-53. Vacatur of the 2022 SPP Orders would redress these injuries.

## STANDARD OF REVIEW

The Court must "set aside" any agency order that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2). "FERC—like all agencies—must engage in reasoned decisionmaking" and "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *New Eng. Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 210 (D.C. Cir. 2018) (*NEPGA*) (quoting *Motor Vehicle Mfrs. Assn v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). Although FERC need not "allocate costs with 'exacting precision,'" the Court must "set aside cost allocations that are either unreasonable or inadequately explained." *LIPA*, 27 F.4th at 712 (quoting *ODEC*, 898 F.3d at 1260 (listing

23

examples from this Court and sister courts where FERC cost allocations have been reversed on these grounds)).

Moreover, FERC must "respond meaningfully to the arguments raised before it," *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) (citation omitted). Unless FERC "answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001). FERC's fact findings must in turn be based on substantial evidence that, at a minimum, "supports the Commission's ultimate decision." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 363, 645 (D.C. Cir. 2010) (citing *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003)).

FERC must also "provide a reasoned explanation for departing from precedent or treating similar situations differently." *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) (cleaned up). Although FERC "need not demonstrate to a court's satisfaction that the reasons for [a] new policy change are *better* than the reasons for the old one," it must "ordinarily … display awareness that it *is* changing position." *NEPGA*, 881 F.3d at 210 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)) (alterations in original). FERC therefore "may not … depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* (quoting *Fox Television*, 556 U.S. at 515).

**ARGUMENT**

I.    **FERC Violated Core Requirements Under FPA Section 205**

    A. **FERC Unlawfully Accepted Tariff Provisions that Will Systematically Exclude Zonally Beneficial Projects from Zonal and Regional Cost Allocation in Violation of the Cost Causation Principle**

FPA section 205 requires all FERC-jurisdictional rates to be "just, reasonable, and not unduly discriminatory or preferential." 16 U.S.C. § 824d. This statutory mandate incorporates the cost causation principle, which "requires comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party." *ODEC*, 898 F.3d at 1260. In the context of transmission cost allocation, "the cost-causation principle focuses on project benefits, not on how particular planning criteria were developed." *Id.* at 1262. In *ODEC*, this Court established the proposition that it is not just and reasonable for FERC to categorically "prohibit cost sharing for any project included in [a] Regional Plan only to satisfy individual utilities' planning criteria." *Id.* at 1257; *accord Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 17 (D.C. Cir. 2021) ("FERC is not allowed to exempt all reliability projects from cost sharing ….").

In its recent opinions applying *ODEC*, this Court has reiterated that, "[e]ven if the intended purpose of a transmission project is to fix a reliability problem in one zone, that does not mean its benefits will be limited to that zone." *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1019 (D.C. Cir. 2022).

Transmission project benefits are not "confined to the artificial boundaries of the local pricing zone" due to "the interconnected nature of the grid." *Id*. Thus, "in order for a cost allocation method to be consistent with the cost causation principle, such method cannot 'prevent[] regionally beneficial projects from being arbitrarily excluded from cost sharing.'" *Entergy Ark., LLC v. FERC*, 40 F.4th 689, 701 (D.C. Cir. 2022) (quoting *ODEC*, 898 F.3d at 1263);

Nevertheless, that is exactly what FERC's orders below authorize SPP to do. The 2022 SPP Proposal will arbitrarily, and systematically, prevent regionally beneficial projects identified by an individual utility's planning criteria from being included in regional or zonal cost sharing. The express purpose of SPP's proposal was to modify the zonal planning process to prevent "zonal cost allocation for transmission facilities that address individual transmission owners' local planning criteria unless those facilities are also needed to address zonal transmission needs driven by SPP's regional planning criteria." Modification Order P 42, JA417-18.[6] SPP accomplished this purpose by instituting a byzantine, two-step voting process for the adoption of Zonal Planning Criteria that ensures such criteria will not be adopted absent an infeasible degree of zonal "consensus" approaching unanimity.

---

[6] The Tariff changes filed by SPP largely consist of striking terms like "company-specific planning criteria," "local area planning criteria," "individual Transmission Owner criteria," "local area reliability criteria," and "Local Planning Criteria" to replace those terms with "Zonal Planning Criteria." JA027-49.

In the Zones where Evergy operates, SPP's voting rules would allow any utility to veto the adoption of Zonal Planning Criteria.  *See* Indicated SPP Transmission Owners Protest (hereinafter, Evergy Protest) at 10-12, JA128-30; Evergy Rehearing Request at 14-16, JA282-84.  This is an invitation to free riding by Transmission Customers, who have every incentive to exercise that veto power to reap the benefits of Zonal Reliability Upgrades without paying for them.  Thus, Evergy projects will be denied zonal cost allocation unless other utilities voluntarily act contrary to their economic self-interest.

Evergy and GridLiance, like all other Transmission Owners, have statutory and regulatory obligations to maintain a reliable transmission system, develop planning criteria to meet those obligations, and construct projects based upon those criteria and obligations.  Those responsibilities do not go away even if other utilities in the Zone vote to eliminate those criteria and revert to the minimal SPP criteria because each Transmission Owner will still need to construct projects to maintain reliability.  The other utilities in the Zone who benefit from these reliability projects know this and can now force 100% of the costs on the constructing Transmission Owner's customers by merely vetoing proposed Zonal Planning Criteria and reverting back to SPP's minimal planning criteria which, as amended below, prevent the possibility of zonal cost recovery by eliminating all references to SPP's reliance on local planning criteria in the regional planning process.  *See supra* note 6.  Before

now, no single utility had the ability to block projects at any level of the SPP planning process when a project was shown to provide zonal or regional benefits.[7] It is incompatible with *ODEC* and subsequent precedent for FERC to accept Tariff provisions that will systematically exclude projects from zonal cost allocation.

The problem is even worse for GridLiance as a transmission-only utility that lacks retail customers because GridLiance is dependent on dominant load-serving Facilitating Transmission Owners to propose Zonal Planning Criteria. Thus, like Evergy, GridLiance will not be able to obtain regional cost allocation for projects that benefit other utilities in the Zones where it operates unless those entities choose to pay for benefits that FERC will now let them have for free. Unlike Evergy, GridLiance has no retail customers that could be directly assigned project costs. GridLiance therefore would have no way to recover the costs of necessary transmission projects identified by its local planning process. *See* GridLiance Rehearing Request at 11-12, JA337-38.

Still worse, FERC denied requests for clarification "that transmission owners without retail customers that elect to continue to use their own local planning criteria instead of the Zonal Planning Criteria adopted in their zones would be able to continue to recover their costs through the zonal annual transmission revenue

---

[7] Interestingly, SPP does not hold itself to this same standard. It does not permit any single entity to block its own decisions about regional cost allocation.

requirement" because that "contravenes both the purpose of SPP's proposal and the language of section II.5.j of Attachment O."  Modification Order P 54, JA427-28. That Zonal Annual Transmission Revenue Requirement is the only way shareholders in merchant transmission companies like GridLiance and ITC Great Plains (a transmission-only utility that joined Evergy in the Indicated SPP Transmission Owners pleadings below) can recover their costs from Transmission Customers. Nevertheless, FERC held that it "contravenes both the purpose of SPP's proposal and the language of section II.5.j of Attachment O" to permit transmission-only utilities to recover the costs of transmission projects built to comply with local planning processes that FERC itself has specifically approved GridLiance to use.  In short, SPP's Tariff revisions specifically eliminate zonal cost allocation for projects identified pursuant to a FERC-approved local planning process outside of the new Zonal Planning process, without regard for zonal benefits.

FERC has offered various excuses for failing to adhere to *ODEC* and this court's other precedents, each of which lacks merit.  FERC initially claimed *ODEC* was distinguishable because it involved a category of high voltage projects that FERC had conceded would confer regional benefits.  *See* June 28 Order at P 56, JA264; Evergy Rehearing Request at 11, JA279.  Petitioners explained this cramped interpretation effectively limited *ODEC* to its specific facts.  *Id.* at 11-12, JA279-80; GridLiance Rehearing Request at 10-11, JA337-38.   The Modification Order

retreated from FERC's initial position but offered a new theory that *ODEC* is inapplicable because there is no evidence that transmission projects developed through local planning criteria could ever provide zonal or regional benefits. *See, e.g.*, Modification Order at P 47, JA422. FERC's position is belied by its acknowledgement of record evidence that 26 Zonal Reliability Upgrades were identified under local planning criteria between 2011 and 2020. *Id.* Moreover, FERC's rationale unlawfully shifts the burden of proof under section 205 of the FPA from SPP as the filing utility to the Petitioners, *see infra* at 37-42, and is based on an arbitrary and capricious fundamental misunderstanding of the Tariff's planning provisions, *see infra* at 45-47.

FERC cannot wish away the fact that local planning processes can, and do, identify projects with zonal benefits that cannot be identified under SPP's Planning Criteria.[8] Denying cost allocation for such projects cannot be squared with the cost causation principle. *See* Evergy Protest at 14-15, JA132-33; Evergy Rehearing

---

[8] The map *supra* at 12 graphically demonstrates the degree to which certain embedded Transmission Owners will naturally derive benefits from system upgrades simply because of their "electrical proximity." *LIPA*, 27 F.4th at 713; *accord Coal. of MISO Transmission Customers*, 45 F.4th at 1019 ("The notion that the benefits of a new transmission facility are confined to the artificial boundaries of the local pricing zone ignores the interconnected nature of the grid.") (cleaned up). For example, the system operated by the City of Independence in Zone 6 will inevitably benefit from reliability projects constructed by Evergy Metro within that Zone as well as projects constructed by Evergy Missouri West in Zone 9 because the City of Independence is entirely surrounded by Evergy transmission facilities.

Request at 6-9, JA274-77; GridLiance Protest at 13-15, JA085-87; GridLiance Rehearing Request at 9, JA335; OG&E Protest at 14-15, JA159-60; OG&E Rehearing Request at 17-18, JA322-23.

FERC also contended that it did not violate *ODEC* because it "disagrees" that utilities will fail to unanimously agree on Zonal Planning Criteria. Modification Order at P 46, JA421. FERC could only be right if it is reasonable to believe utilities will act contrary to their economic self-interest; but FERC itself does not appear to believe any such proposition. FERC argues that

> disallowing zonal cost allocation for facilities that are 'exclusively' identified as needed under an individual transmission owner's local planning criteria appropriately abates the incentive transmission owners otherwise have, *as rational economic entities*, to develop upgrades that solely or disproportionately benefit their own customers but whose costs can be allocated on a zonal basis.

Modification Order at P 51, JA425-26 (footnote omitted) (emphasis added). Ironically, FERC cites the same precedents concerning its need to account for economic incentives that Evergy invoked to support its request for rehearing. *Compare* Modification Order at n.161, JA426, *with* Evergy Rehearing Request at 17, JA285. FERC's position that the voting process for approving Zonal Planning Criteria will not deadlock because it was intended to promote "transparency" is, at best, wishful thinking. *See infra* at 32-33. It is not a defensible reason to violate the cost causation principle. In reality, FERC's 2022 Orders invert and exacerbate the very problem that led FERC to reject the 2020 SPP Proposal.

31

### 1. FERC Irrationally Accepted a Broken "Transparency" Remedy to Solve a Non-Existent Cost Allocation Problem

FERC justified its acceptance of SPP's Tariff revisions in part on SPP's proffered goal of promoting greater "transparency" to solve a perceived risk that dominant Facilitating Transmission Owners might abuse their positions to build projects that "disproportionately benefit" the Facilitating Transmission Owner and its customers. Modification Order at PP 45, 51, JA420-21, 425-26. Neither SPP nor FERC provided any evidence to substantiate that risk. Indeed, as Evergy and GridLiance explained, that problem did not actually exist before SPP submitted its Tariff revisions, and the cure FERC accepted was significantly more destructive than the purported disease. *See, e.g.*, Evergy Rehearing Request at 24, JA292; GridLiance Protest at 15, JA087. That is why, contrary to FERC's flowery statements regarding SPP's stakeholder process, SPP's proposal actually failed at the SPP Markets and Operations Policy Committee, SPP's only full stakeholder representation group. *See* GridLiance Protest 1-2, JA073-74.

To the extent a Facilitating Transmission Owner were to propose Zonal Planning Criteria that might "disproportionately benefit" the Facilitating Transmission Owner or its customers—and, again, there is no evidence in this record to suggest that ever occurred—the previous rules already solved that concern because Zonal Reliability Upgrades are "allocated to all load in the Zone based on a Load Ratio Share, regardless of which Transmission Owner's criteria resulted in

32

construction of the upgrade." SPP Transmittal Letter at 10 & n.45, JA010 (citing Tariff definitions); *see* June 28 Order at P 2, JA243. As a result, the benefits associated with Zonal Reliability Upgrades were already consistent with cost causation and the beneficiary pays principle.

### 2. FERC Irrationally Inverted and Exacerbated Concerns About Zonal Planning Coordination By Disregarding Petitioners' Arguments, Endorsing Inconsistent Treatment Between Zones, and Failing to Distinguish Relevant Precedent

Petitioners established that SPP's new voting procedures will create gridlock in numerous Zones, including those where Petitioners operate. *See* Evergy Rehearing Request at 14-16, JA282-84 (emphasizing that any utility can veto proposals); GridLiance Rehearing Request at 10, JA082 (emphasizing that "the largest load can unilaterally choose that no local planning will be performed through SPP's process in a given zone"). FERC did not dispute this concern, but instead offered the conclusory assertion that it did "not agree that the Tariff provisions will 'impede the adoption of Zonal Planning Criteria,' or undermine transmission planning goals, given that they are designed to have the opposite effect." Modification Order at P 64, JA433-34 (quoting Evergy Rehearing Request at 30, JA298). FERC made no attempt to balance the certainty of planning gridlock against the theoretical benefits of pursuing "consensus."

FERC nonetheless accepted SPP's new byzantine two-step voting scheme that will systematically cause significant dislocation throughout the SPP region. FERC's

acceptance was inconsistent with the June 28 Order's acceptance of a more effective voting system to prevent gridlock in Zone 19 and FERC's recent approval of voting reform measures in a larger RTO, PJM Interconnection, L.L.C. (PJM), to prevent small utilities from vetoing transmission rate proposals supported by Transmission Owners who own 98% percent or more of the PJM transmission system—which, coincidentally, is the same as Evergy's ownership in Zone 9.  *See, e.g.*, Evergy Protest at 20-22, JA138-40; June 28 Order at P 22, JA252 (noting OG&E's argument that 95% support would be required in Zone 7).  FERC dismissed Evergy's objections as "alternatives" that it "did not need to consider" under FPA section 205. Modification Order at PP 14, 24, JA397-98, 405.  Not so.  In presenting different voting mechanisms that would not instantly create gridlock in numerous multi-Transmission Owner Zones, Evergy was merely illustrating the flaws in SPP's Tariff amendments and showing that those flaws were avoidable, inconsistent with recent precedent, and unjust and unreasonable.

For example, SPP exempted Zone 19 from the new voting rules and allowed it to retain its own two-step voting system.  "The threshold for adopting the Zonal Planning Criteria in the Zone 19 voting process is 75% of the single vote and no single entity can account for over 33% of the weighted vote relating to either vote component."  June 28 Order at P 10, JA248.  Petitioners argued this difference was unduly discriminatory because Zone 19 Transmission Owners "face the same

challenges and circumstances as their counterparts [in] other Zones." Evergy Rehearing Request at 32, JA300. FERC rejected that argument on the ground that Transmission Owners in Zone 19 are not "similarly situated" to Transmission Owners in other Zones because Zone 19 independently adopted consensus planning rules before SPP filed its new voting rules; thus, in FERC's view, "exempting Zone 19 from the two-step voting process constituted comparable treatment in the transmission planning process." Modification Order at P 57, JA429.

That is not a sensible response to Petitioners' objections; it is instead a defense of blanket punishment for utilities stuck in heavily imbalanced Zones. The treatment of Zone 19 is obviously not "comparable" to the treatment of other Zones. For example, the Zone 19 voting structure does not permit individual entities representing less than 2% of the Zone to veto Zonal Planning Criteria because, unlike other Zones, Zone 19 does not require "a percentage of vote to approve greater than or equal to the largest load in the Zone plus one-half of the remainder of the load in the Zone." JA013. If one accepts FERC's premise that the absence of consensus was a problem that needed to be cured, then FERC did nothing to improve the situation by providing small entities with extraordinary voting power. Worse, contrary to FERC's representation that "any other zone may request proposed Tariff revisions to implement a voting process in lieu of the two-step voting process in Attachment O," Modification Order at P 57, JA429, it is not feasible to alter the

35

voting rules SPP has imposed.  The same voting rules that make it impossible to adopt Zonal Planning Criteria also make it impossible to modify the voting rules.

FERC also failed to rationally distinguish its precedent approving load-weighted voting mechanisms in RTOs.  Just months before the June 28 Order, FERC accepted a series of amendments to the PJM Consolidated Transmission Operating Agreement (CTOA), which governs voting among PJM's Transmission Owners on proposed PJM Tariff amendments concerning transmission planning and cost allocation.  *Pub. Serv. Elec. & Gas Co.*, 179 FERC ¶ 61,001, at P 1 (2022) (*PSEG*).  In that case, the major utilities that formed PJM sought to change their voting rules because a substantial influx of very small Transmission Owners in recent years made it infeasible for the major utilities in PJM to pass proposals based on a 2/3 individual vote requirement despite the fact that such new Transmission Owners owned a tiny fraction of the region's transmission facilities.  *Id.* P 6.  To remedy this problem, the PJM Transmission Owners altered their agreement to provide that individual vote approval by a simple majority or 2/3 majority is not required when the load-weighted vote exceeds 95%.  *Id.* P 7.  FERC accepted these amendments, noting that "the proposed CTOA revisions will help prevent entities with relatively small transmission investments from using that stake to prevent filings that are supported by the Transmission Owners with substantial investment in the PJM transmission system."  *Id.* P 20.

FERC's acceptance of SPP's proposed voting scheme contravened its recent precedent in *PSEG*, but FERC denied the existence of a conflict. Thus, FERC failed to distinguish its holding about an equivalent rule in a peer RTO, and that is a reversible error. *See, e.g.*, *NEPGA*, 881 F.3d at 211-13 (reversing FERC orders that failed to reconcile material differences in rules between two RTOs).

### B. FERC Unlawfully Shifted the Burden of Proof from SPP to Petitioners

FPA section 205 places the burden of proof on the proponent of a rate change. *See* 16 U.S.C. § 824d(e); *In re NTE Conn., LLC*, 26 F.4th 980, 989-90 (D.C. Cir. 2022) (citing *Ala. Power Co. v. FERC*, 993 F.2d 1557, 1571 (D.C. Cir. 1993)). The APA is no different. *See* 5 U.S.C. § 556(d); *Dir., OWCP v. Greenwich Collieries*, 512 U.S. 267, 275-76 (1994). As FERC recently explained in another SPP order, "where a filing is made under section 205 of the FPA, the burden of proof is on the filing party to show that its proposal is just and reasonable; the onus is not on protestors to show that the proposal is unjust and unreasonable." *Sw. Power Pool, Inc.*, Op. No. 579, 180 FERC ¶ 61,192, at P 53 & n.125 (2022) (cleaned up). The party seeking a rate change must therefore provide sufficient evidence to establish a *prima facie* case, after which the burden shifts to the opposing party to rebut the *prima facie* case. *Id.* At bottom, however, "[t]he ultimate burden of persuasion … remains with the proponents," who will either "prevail if a preponderance of

evidence supports their position" or "lose 'if the evidence is evenly balanced.'" *Id.* (quoting *Greenwich Collieries*, 512 U.S. at 272).

In the proceeding below, SPP filed Tariff revisions it asserted were just and reasonable. JA001-24. Petitioners demonstrated that the practical effects of SPP's Tariff amendments and proposed voting scheme would categorically exclude future transmission projects from inclusion in SPP's zonal and regional planning criteria and thus render them ineligible for cost allocation, a plain violation of the cost causation principle this Court articulated in *ODEC*. JA085-87, JA128-30.

As previously discussed, the June 28 Order rejected Petitioners' arguments because

> *no evidence* has been presented indicating that transmission facilities needed to address only individual transmission owner local planning criteria in a multi-transmission owner zone confer benefits on other transmission owners or other transmission owners' customers in the relevant zone sufficient to support a finding that the costs of such facilities must be allocated zonally.

June 28 Order at P 56, JA264 (emphasis added). Petitioners argued this "summary dismissal" impermissibly shifted the burden of proof from SPP by requiring protestors "to make some kind of empirical evidentiary demonstration that SPP's voting process would fail beyond identifying the obvious incentives it creates for blocking Zonal Planning Criteria." Evergy Rehearing Request at 3, 16-19, JA271, JA284-87; *see* GridLiance Rehearing Request at 5-6, JA331-32 (listing cases). GridLiance further asserted that FERC provided "only a single, summarily

dismissive sentence to the pages of evidence and multiple examples of benefits that local transmission projects, identified through a transmission owner's own local planning criteria, confer on other transmission owners or customers within a relevant zone." *Id.* at 9, JA335.

The Modification Order rejected these arguments, claiming that FERC "did not shift the burden of proof to the intervenors" for two reasons. Modification Order at P 50, JA424; *accord id.* P 27, JA407.

First, FERC claimed it "did not shift the burden to protesters to make any showing, but rather referred to the evidence in the record as a whole" when it wrote "that 'no evidence has been presented' that transmission facilities that address only individual transmission owner local planning criteria in a zone comprised of multiple transmission owners confer benefits on other transmission owners and customers in the zone." *Id.* P 50, JA424-25. That claim is false on its face. FERC explicitly based its determination that SPP's proposal was just and reasonable on the finding that *protestors* failed to prove that zonal projects adopted through the *existing* process "confer benefits on other transmission owners or other transmission owners' customers in the relevant zone sufficient to support a finding that the costs of such facilities must be allocated zonally." June 28 Order at P 56, JA264. That is the burden placed on complainants in an FPA section 206 proceeding, not what protestors must show in an FPA section 205 proceeding. *See FirstEnergy*, 758 F.3d

at 353.  Moreover, contrary to FERC's claim that there was "no evidence" the existing system had produced zonal reliability projects that actually "confer benefits," Petitioners presented substantial and uncontroverted evidence that 26 such projects are in service now.  GridLiance Protest at 13-19, JA085-91; Evergy Protest at 10-12, JA128-30.  FERC simply disregarded that evidence.

Indeed, FERC *continues* to place the evidentiary burden on Petitioners because FERC did so *again* in the Modification Order, both before and after it claimed it had not.  For example, the sentence immediately preceding FERC's disclaimer rejected Petitioners' reliance on *ODEC* because Petitioners did not present evidence of "identified benefits or categorical exclusion" to demonstrate a "violation of the cost causation principle."  Modification Order at P 49, JA424.  The paragraph immediately following FERC's disclaimer removes any doubt FERC demanded proof from the Petitioners, arguing that "the record does not show that [transmission] facilities, planned under the prior SPP process, are likely to provide significant benefits to other transmission owners and customers in a zone comprised of multiple transmission owners."  *Id.* P 51, JA425; *accord id.* P 43, JA419-20 ("Indicated SPP TOs and GridLiance point to no evidence suggesting that upgrades identified using transmission owners' local planning criteria are likely to provide benefits to other transmission owners and customers in a zone.").

In short, FERC found SPP's proposal just and reasonable because, in FERC's view, the Petitioners did not prove the pre-existing system was just and reasonable. That is not the law.  Existing rates on file at FERC are, by definition, just and reasonable unless and until FERC sets those rates aside in a proceeding under FPA section 206.  *See* 16 U.S.C. § 824d; *FirstEnergy*, 758 F.3d at 353.  It is thus bizarre for FERC to question the validity of Petitioners' evidence demonstrating that the 26 Zonal Reliability Upgrades placed into service under the pre-existing Tariff "are likely to provide benefits to other transmission owners and customers in a zone." Modification Order P 43, JA419-20.  The purpose of that evidence was to indicate there would be an identifiable cost to modifying SPP's Tariff in a manner that categorically excludes consideration of cost allocation for projects built to address individual utilities' reliability criteria.  FERC ducked that important issue by impermissibly inverting the burden of proof.

Second, FERC claims that "SPP did not bear a particular burden of proof because this aspect of its filing was not a proposal, but simply a right that transmission owners always have."  *Id.* P 50, JA424-25.  That is nonsense.  The unchanged "aspect" of SPP's proposal was that utilities can, as always, decide to build transmission projects that they themselves exclusively fund.  *Id.*  But the 2022 SPP Proposal is a rate change in and of itself that changed the *status quo* in important ways by implementing a new direct assignment cost allocation methodology in

41

Section II.5.j.  That provision stripped Transmission Owners of their ability to have their local reliability requirements considered for regional or zonal cost allocation absent a degree of zonal "consensus" that effectively amounts to zonal unanimity. *See supra* at 25-37.  However, as explained above, the new rules make "consensus" impossible in some Zones and the amended Tariff provides no avenue for project-specific review or other means of recourse to obtain regional or zonal cost allocation by demonstrating that a project will produce zonal and regional benefits.

FERC's argument in the Modification Order either entirely misunderstands the rehearing argument or intentionally ignores it.  It is not about the "right" transmission owners have to construct upgrades, but the fact that SPP changed the cost-allocation for projects built to satisfy local planning criteria, and the Modification Order simply does not address this issue.

In sum, neither of the reasons FERC gave to excuse itself from shifting the burden of proof in this case survive scrutiny.  This requires remand and vacatur.  *See Greenwich Collieries*, 512 U.S. at 276, 280-81 (affirming vacatur where agency violated the APA by shifting the burden of persuasion).

### C. FERC Unlawfully Imposed Significant New Planning Burdens on Facilitating Transmission Owners Without Compensation

Evergy explained that the excessive compliance burdens imposed by the 2022 SPP Proposal amount to unfunded mandates on each Zone's Facilitating Transmission Owner.  Evergy Rehearing Request at 23, JA291; Evergy Protest at

42

23-24, JA141-42. Planning criteria are vital to ensure reliable and safe transmission service, and Transmission Owners accordingly expend significant time and resources to develop them. Evergy Rehearing Request at 24, JA292.

Nonetheless, FERC only responded to Evergy's concerns by stating that any "potential burdens" the Facilitating Transmission Owner would sustain from "taking the lead in facilitating the process for developing Zonal Planning Criteria, are reasonable in light of the importance of ensuring participation and transparency in the transmission planning process." Modification Order at P 71, JA438; *see also* June 28 Order at P 58, JA265 ("[W]e acknowledge that the proposed process would add to the administrative burden of the Facilitating Transmission Owner. We find, however, given the need to ensure participation and transparency, it is reasonable for Facilitating Transmission Owners, which we expect will usually be the transmission owner with the largest load in the zone, to take the lead in facilitating the process for developing Zonal Planning Criteria."). But neither the Modification Order nor the June 28 Order grappled with Evergy's objections surrounding SPP's failure to compensate Facilitating Transmission Owners for the significant costs they will incur in preparing Zonal Planning Criteria.

It was insufficient for FERC to admit that the 2022 SPP Proposal imposes new burdens on Facilitating Transmission Owners and summarily reject Evergy's concerns with the costs of those burdens by alluding to the nebulous benefits of

"ensuring participation and transparency." As Evergy explained, neither purported benefit that FERC suggests was a problem before this proceeding. *See supra* at 32-33; Evergy Rehearing Request at 24, JA292. FERC must "respond meaningfully to the arguments raised before it," *TransCanada Power Mktg.*, 811 F.3d at 12, and unless it "answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." *NTE*, 26 F.4th at 989 (quoting *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005)). FERC concluded that it is reasonable for SPP to impose compliance obligations on Facilitating Transmission Owners, it did not answer whether it is reasonable to impose the costs of complying with SPP's new requirements on Facilitating Transmission Owners. FERC "could not simply ignore" Evergy's objections regarding the costs of SPP's compliance obligations that Facilitating Transmission Owners will uniquely bear, *id.*, and FERC's decision to do so requires vacatur and remand.

In addition to being insufficiently explained, FERC's decision was also substantively unlawful. The Fifth Amendment prohibits the federal government from taking private property—including labor and services—without providing just compensation. That constitutional requirement "coincides with" the FPA's statutory requirement that rates be just and reasonable. *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1175 (D.C. Cir. 1987) (citing *FPC v. Nat. Gas Pipeline Co.*, 315 U.S. 575, 586 (1942)); *accord Trunkline Gas Co. v. FERC*, 880 F.2d 546, 552

(D.C. Cir. 1989). This is also the same constitutional and statutory objective that the cost causation principle is designed to satisfy in the context of transmission cost allocation. FERC violated all of these principles by accepting SPP's proposal to impose a myriad of compliance mandates on Facilitating Transmission Owners without providing *any* compensation for their services. Vacatur of the underlying orders is therefore appropriate.

## II.    FERC Failed to Engage in Reasoned Decisionmaking Under the APA

### A. FERC Premised Its Decision on a Fundamental Misunderstanding of SPP's Proposal that FERC Declined to Correct

FERC rested its case on its finding that "SPP's planning criteria will appropriately identify the transmission facilities that confer reliability benefits on multiple transmission owners or transmission customers in the relevant Zone because the criteria are consistent with NERC reliability standards and additional requirements adopted by SPP." June 28 Order at P 55, JA264. This conclusion is patently false and cannot serve as a legitimate purpose for accepting SPP's flawed Tariff revisions.

As explained in the Holland Affidavit, SPP "does not utilize any specific load models or local-specific scenarios that are needed to ensure local reliability," and its regional planning criteria only consider Transmission Owners' voltage criteria that are more stringent than SPP's. Holland Aff. ¶¶ 11-12, 19, JA109-10. Critically, SPP's regional planning criteria ignore numerous factors that Transmission Owners

45

include in their local planning criteria to address unique local needs, including load loss exposure calculations, voltage deviations, and load service requirements.  *Id.* ¶ 17, JA110-11; *see also* OG&E Protest at 15 ("The SPP Planning Criteria are broad and generic and, as applied to OG&E, would fail to account for the nuances of the lower voltage … lines on OG&E's system, which serve a material amount of load.").

Between 2011 and 2020, SPP identified 26 Zonal Reliability Upgrades based on a Transmission Owner's individual local planning criteria.  Holland Aff. ¶ 14, JA110.  Moreover, Evergy provided two examples of previous upgrades that "provided reliability benefits not just to [Evergy] and [its] customers but other Transmission Customers in the relevant Zones," but "would never have been identified under the SPP Planning Criteria."  Evergy Rehearing Request at 7, JA275.

In spite of this evidence, FERC asserted that "no evidence" was put forth "indicating that transmission facilities needed to address individual transmission owner local planning criteria in a multi-transmission owner zone confer benefits on other transmission owners or other transmission owners' customers in the relevant zone sufficient to support a finding that the costs of such facilities must be allocated zonally."  June 28 Order at P 56, JA264.  On rehearing, FERC simply repeated its conclusion that Petitioners "point to no evidence suggesting that upgrades identified using transmission owners' local planning criteria are likely to provide benefits to other transmission owners and zones."  Modification Order at P 44, JA420.  In doing

so, FERC not only ignored record evidence of projects that will be rendered ineligible for cost allocation in SPP, but, as discussed *supra* at 37-42, also unlawfully shifted the burden of proof from SPP to Petitioners.

FERC's orders are grounded in the erroneous assumption that SPP's planning criteria "will appropriately identify the transmission facilities that confer reliability benefits on multiple transmission owners or transmission customers in the relevant Zone." June 28 Order at P 55, JA264. Because that error infects all of FERC's reasoning, FERC failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *PPL Wallingford*, 419 F.3d at 1198 (cleaned up).

## B. The 2022 SPP Orders Arbitrarily and Capriciously Allow SPP to Abdicate Its Planning Responsibilities and Fail to Justify Inconsistencies with the 2020 SPP Order

Petitioners have consistently emphasized that the 2022 SPP Proposal allows SPP to abdicate any responsibility for the development of Zonal Planning Criteria. This abdication is flatly inconsistent with the transmission planning obligations SPP must perform under Order Nos. 1000 and 2000. *See, e.g.*, Evergy Rehearing Request at 26-30, JA294-98. FERC's orders below dodged genuine engagement with this issue, but FERC's evasions cannot change the fact that SPP continues to play "no role" in developing Zonal Planning Criteria in violation of FERC's own regulations. *See* 2020 SPP Order, 172 FERC ¶ 61,202 at P 40.

FERC concedes SPP will play a "limited role" in developing Zonal Planning Criteria. Modification Order at P 63, JA432-33, but even that assertion is overstated. Per FERC, the only time SPP might possibly participate would be a dispute over the tabulation of the final vote on proposed Zonal Planning Criteria. *See id*. n.193, JA433. Even then, SPP's role is confined to designating a representative to confer with a "representative of the Facilitating Transmission Owner for resolution on an informal basis." SPP Tariff, Attach. O, § II.5.d.i, JA037-38. Beyond that, SPP's role in the development of Zonal Planning Criteria remains entirely passive, confined to receiving meeting notes, reports, and any approved criteria. *Id.* § II.5.a, JA033. SPP is not involved in the creation, revision, or review of Zonal Planning Criteria. *Id.* Nor is SPP responsible for the final decision to adopt or to reject any criteria that might be approved. *Id.*

FERC muddies the waters by noting that SPP will apply any approved Zonal Planning Criteria that might actually be developed. *See, e.g.*, Modification Order at P 63, JA432-33. But the fact that SPP will *apply* Zonal Planning Criteria does not mean SPP plays any part in *developing* them. Petitioners have shown, and FERC has barely disputed, that SPP's abdication of any role in developing the criteria contravenes Order Nos. 1000 and 2000.

FERC claims SPP met its obligations under Order Nos. 1000 and 2000 because the 2022 SPP Proposal addressed FERC's concern that the 2020 SPP

Proposal gave Facilitating Transmission Owners "sole control" over Zonal Planning Criteria. *See id.* FERC asserts SPP remedied this problem by "providing meaningful opportunities for stakeholder input" and reducing Facilitating Transmission Owners' discretion. *Id*. (citing June 28 Order at P 46). Those statements are non-sequiturs. Providing greater "transparency" and "coordination" in a stakeholder process administered by Facilitating Transmission Owners may address FERC's concerns from 2020, but that does not mean SPP is meeting its obligations under FERC's planning rules to develop Zonal Planning Criteria. Indeed, SPP's now has *less* responsibility for zonal reliability because, as Petitioners have demonstrated, the new voting rules effectively guarantee that it will be impossible to achieve consensus Zonal Planning Criteria in several Zones, including those where Petitioners operate.

FERC continues to obscure the fundamental inconsistency between its rejection of the 2020 SPP Proposal and its acceptance of the 2022 SPP Proposal. If Facilitating Transmission Owners must not have "sole control" over access to zonal cost allocation then it cannot simultaneously be permissible for individual entities to have "sole control" in the form of a unilateral veto over proposed Zonal Planning Criteria. FERC merely exchanged one problem for another by empowering smaller Transmission Owners and Transmission Customers to avoid any zonal cost allocation by vetoing Zonal Planning Criteria, regardless of any benefits those smaller entities might receive. Evergy Rehearing Request at 19-21, JA287-89.

The Modification Order ignored this concern once again by failing to provide any rational explanation for the asymmetry between its rulings in 2020 and 2022. It is irrational for FERC to insist the 2022 SPP Proposal is just and reasonable, and that it will not "'impede the adoption of Zonal Planning Criteria,' or undermine transmission planning goals, given that they are designed to have the opposite effect." Modification Order P 64, JA433-34. SPP's intent cannot justify FERC ignoring the manifest flaws in SPP's design. Petitioners demonstrated that SPP's revisions will not, in fact, "encourage[e] stakeholders to work together toward adopting Zonal Planning Criteria" in their respective Zones. *Id.*; *see supra* at 27-28. FERC did not attempt to disprove Petitioners' assessment that the inevitable effect of SPP's new voting requirements in their Zones would be gridlock. Nor did FERC attempt to balance purported "transparency" benefits against the costs imposed by planning gridlock: *i.e.*, forcing Evergy to subsidize free riders and depriving GridLiance of any opportunity for zonal cost recovery.

FERC's repeated failure to meaningfully engage that problem was arbitrary and capricious. *See PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011). So, too, was FERC's pretense of that the 2022 SPP Proposal did not conflict with the 2020 SPP Order, Order No. 1000, and Order No. 2000. *See W. Deptford Energy*, 766 F.3d at 20.

## C. FERC Ignored the 2022 SPP Proposal's Adverse Impacts on Reliability

FERC also ignored substantial evidence regarding the adverse effects on reliability that SPP's Tariff revisions will cause. Specifically, Petitioners demonstrated that the Tariff amendments will disincentivize crucial transmission investments and will encourage "lowest common denominator" localized planning and expansion processes as Transmission Owners and Transmission Customers in each Zone seek to save money on localized upgrades sponsored and constructed by other Transmission Owners as local projects. Evergy Rehearing Request at 30, JA298; Evergy Protest at 13, JA131; GridLiance Protest at 17, JA089. Because utilities remain obliged to maintain reliability on their local systems regardless of zonal consensus, SPP's voting rules eliminate any incentive for individual utilities to agree to Zonal Planning Criteria even when it would be more economically efficient to develop a long-term, holistic solution that benefits all Transmission Owners and Transmission Customers in the same Zone. Evergy Rehearing Request at 30, JA298. This is a puzzling outcome given that FERC's recent Planning NOPR cautions that FERC prefers transmission plans that "right-size" transmission planning in order to "more efficiently or cost-effectively address transmission needs identified through Long-Term Regional Transmission Planning." Planning NOPR at P 399. But it is difficult to right-size transmission projects when SPP's proposal renders it "every man for himself" on cost responsibility. Here, by providing strong

incentives to reject Zonal Planning Criteria, FERC will deprive SPP of "the information necessary to identify the benefits regional transmission facilities may provide in deferring or eliminating the need for in-kind replacements." *Id.*

Moreover, Petitioners demonstrated that SPP's Tariff amendments would result in the use of SPP's regional planning criteria instead of individual Transmission Owners' more appropriately-tailored local planning criteria in Zones that are unable to adopt Zonal Planning Criteria. Evergy Rehearing Request at 31, JA299. These changes would also disrupt established Transmission Owner local planning processes and make it extremely difficult for Transmission Owners to preserve reliability. *Id.*

FERC failed to meaningfully confront any of these concerns. Instead, FERC cast them aside as "speculative," arguing that "if the zone were unable to reach agreement and defaulted to using the SPP regional planning criteria, the use of SPP regional planning criteria would ensure the zone would still meet all NERC reliability standards." Modification Order at P 44, JA420. That is no answer to Petitioners' objections because NERC's mandatory reliability standards *are* the lowest common denominator for reliability. Those nation-wide rules are not intended to, and do not, address enhanced reliability requirements driven by local system conditions. For example, as Evergy explained, if SPP's transmission voltage criteria were used, "the standard voltage regulators on the Evergy Companies'

distribution system are no longer able to bring the voltage up to a level in line with applicable American National Standards Institute standards."[9]  Evergy Rehearing Request at 7, JA275.  FERC also faulted Evergy for "not explain[ing] how using SPP's regional planning criteria, which are consistent with NERC reliability standards and other SPP requirements, will harm reliability," *id.*, but Evergy (along with GridLiance) plainly demonstrated the deleterious effects SPP's Tariff revisions would have on reliability.  Evergy Rehearing Request at 30-31, JA298-99; Evergy Protest at 13-15, JA131-33; GridLiance Protest at 16-21, JA088-93.

FERC has an obligation to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" *NEPGA*, 881 F.3d at 210 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (1983).  In failing to confront the evidence Petitioners put forth, FERC effectively ignored Petitioners' well-founded reliability concerns.  This was manifestly arbitrary and capricious and mandates remand and vacatur.  *See, e.g.*, *PSEG Energy*, 665 F.3d at 207-08, 210-11.

---

[9] The American National Standards Institute (ANSI) has coordinated the development of voluntary consensus standards in the United States for over 100 years, and its guiding principles are followed by entities accredited to develop American National Standards (ANS).  International Organization for Standards, *ANSI*, https://www.iso.org/member/2188.html.  "Though all ANS are developed as voluntary documents, U.S. federal, state, or local bodies are increasingly referring to ANS for regulatory or procurement purposes." *Id.*  NERC developed its reliability standards through an ANSI-accredited process.  *See Policy Statement on Matters Related to Bulk Power System Reliability*, 107 FERC ¶ 61,052, at P 13 (2004).

### III.    The FPA Does Not Require Petitioners to File New Petitions When FERC Issues Substantive Rehearing Orders

FPA section 313 authorizes judicial review of FERC orders and sets clear deadlines for FERC and the parties appearing before it.  Specifically, FERC must issue an order on rehearing within thirty days of a rehearing request, after which "such application may be deemed to have been denied."  16 U.S.C. § 825*l*(a).  An aggrieved party may then file a petition for review no later than "sixty days after the order of the Commission upon the application for rehearing."  *Id.* § 825*l*(b); *see also Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56 (D.C. Cir. 2015) ("Our jurisdiction is thus limited to cases in which a petitioner has first sought rehearing before [FERC] (an exhaustion requirement) and then promptly brings the petition to our court after the order denying rehearing.").

In *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020), this Court ended FERC's longstanding practice of issuing tolling orders that did "nothing more than buy itself more time to act on a rehearing application and stall judicial review." *Allegheny*, 964 F.3d at 9.  Given the "plain statutory language and context," this Court concluded that FERC's then-ubiquitous tolling orders were "not the kind of action on a rehearing application that can fend off a deemed denial and the opportunity for judicial review."  *Id* at 3-4.

Nonetheless, post-*Allegheny* FERC has taken up a new delay tactic in which its Secretary issues "one of two types of notices no earlier than the 31st day after a

rehearing request is received: a Notice of Denial of Rehearing by Operation of Law, or a Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration."[10]  The latter option, which FERC utilized here, merely "states the Commission's *intention* to issue a further order addressing issues raised on rehearing."  *Id.* (emphasis added).  It provides no timeline or guarantee that FERC will actually issue a subsequent order.

FERC is obligated to "respond meaningfully" to arguments on rehearing.  *See, e.g.*, *PSEG Energy*, 665 F.3d at 208.  But under FERC's recent practice, aggrieved parties wishing to exercise their right to seek judicial review are left to speculate whether and when FERC will actually issue a substantive order.

Both Evergy and GridLiance filed timely petitions for review in this Court less than 60 days after FERC denied rehearing by operation of law in *Southwest Power Pool, Inc.*, 180 FERC ¶ 62,095 (2022).  Indeed, Evergy petitioned for review before FERC's order because FERC did not bother to mark that thirty days had passed since Evergy filed its rehearing request.  Evergy and GridLiance had no statutory obligation to wait until the last possible minute to file their petitions to account for the possibility of FERC issuing a substantive order before their sixty-day filing periods elapsed.  Instead, the case became fully ripe for review with

---

[10] *Recent Changes in Commission Rehearing Practice* (Sept. 17, 2020), https://www.ferc.gov/news-events/news/recent-changes-commission-rehearing-practice-item-3.

respect to Evergy on August 22, 2022, and GridLiance and all other parties on August 29, 2022. Remaining within the sixty-day timeline was essential not only to protect Petitioners' rights to judicial review, but also for Petitioners to obtain a substantive rehearing order. Absent Petitioners' prompt requests for judicial review, FERC had no institutional reason to issue a substantive order. *Cf. Coal. of MISO Transmission Customers*, 45 F.4th at 1023 (noting FERC's failure to issue a substantive rehearing order).

There is no meaningful difference between filing a new petition and amending an existing one. And, as Petitioners explained in their October 4, 2022 response to FERC's abeyance motion, filing a new petition for review incurs a material fee, burdens the Court and parties with the wasteful need to draft and process additional filings and case consolidations, and imposes needless delay on all parties. It is simply inequitable, and also a serious drain on judicial economy, to require Petitioners pay an additional fee to account for FERC's failure to issue a rehearing order within the thirty-day timeline prescribed by FPA section 313(a).

Requiring parties to file new petitions whenever FERC subsequently issues a substantive rehearing order will accomplish nothing for the Court and will only encourage FERC to continue its recurrent efforts to "stave off judicial review." *Allegheny*, 964 F.3d at 3. This Court should make clear that parties may amend their petitions to obtain review of orders issued after the original petitions were filed.

## **CONCLUSION**

For the reasons set forth above, the petitions for review should be granted.

Respectfully submitted,

*/s/ John Lee Shepherd, Jr.*

C. Dixon Wallace III
Hunton Andrews Kurth LLP
951 East Byrd Street
Richmond, VA 23219
(804) 344-7955
dwallace@huntonak.com

John Lee Shepherd, Jr.
*Counsel of Record*
Ted J. Murphy
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 955-1500
jshepherd@huntonak.com
tmurphy@huntonak.com

*Counsel for The Evergy Companies and GridLiance High Plains LLC*

Denise M. Buffington
Senior Director of Federal
  Regulatory Affairs
The Evergy Companies
1200 Main Street, 19th Floor
Kansas City, MO 64141
(816) 556-2683
denise.buffington@evergy.com

Travis M. Contratto
FERC Attorney
NextEra Energy, Inc.
700 Universe Blvd.
LAW/SCS
Juno Beach, FL 33408
(305) 442-5066
travis.contratto@nee.com

Patrick T. Smith
Corporate Counsel Director
The Evergy Companies
818 S. Kansas Avenue
P.O. Box 889
Topeka, KS 66601
(785) 508-2574
patrick.smith@evergy.com

*Counsel for GridLiance High
  Plains LLC*

*Counsel for The Evergy Companies*

December 5, 2022

57

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in 14-point Times New Roman, a proportionally spaced font.  I further certify that this brief complies with the type-volume limitations of D.C. Circuit Rule 32(e) because it contains fewer than 13,000 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), according to the count of Microsoft Word.

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.

*Counsel for The Evergy Companies and GridLiance High Plains LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2022, I caused this brief to be electronically filed with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.

*Counsel for The Evergy Companies and GridLiance High Plains LLC*

# ATTACHMENT A
# STATUTORY ADDENDUM

# **TABLE OF CONTENTS**

5 U.S.C. § 556 ................................................................................................. A-1

5 U.S.C. § 706 ................................................................................................. A-3

Federal Power Act section 205, 16 U.S.C. § 824d .............................................. A-5

Federal Power Act section 206, 16 U.S.C. § 824e .............................................. A-6

Federal Power Act section 313, 16 U.S.C. § 825*l* .............................................. A-9

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1005. | June 11, 1946, ch. 324, § 6, 60 Stat. 240. |

In subsection (b), the words "is entitled" are substituted for "shall be accorded the right". The word "officers" is omitted as included in "employees" in view of the definition of "employee" in section 2105. The words "With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time" are substituted for "with reasonable dispatch" and "except that due regard shall be had for the convenience and necessity of the parties or their representatives". The prohibition in the last sentence is restated in positive form and the words "This subsection does not" are substituted for "Nothing herein shall be construed either to".

In subsection (c), the words "in any manner or for any purpose" are omitted as surplusage.

In subsection (e), the word "brief" is substituted for "simple". The words "of the grounds for denial" are substituted for "of procedural or other grounds" for clarity.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

**Editorial Notes**

CODIFICATION

Section 555 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2247 of Title 7, Agriculture.

### § 556. Hearings; presiding employees; powers and duties; burden of proof; evidence; record as basis of decision

(a) This section applies, according to the provisions thereof, to hearings required by section 553 or 554 of this title to be conducted in accordance with this section.

(b) There shall preside at the taking of evidence—

(1) the agency;

(2) one or more members of the body which comprises the agency; or

(3) one or more administrative law judges appointed under section 3105 of this title.

This subchapter does not supersede the conduct of specified classes of proceedings, in whole or in part, by or before boards or other employees specially provided for by or designated under statute. The functions of presiding employees and of employees participating in decisions in accordance with section 557 of this title shall be conducted in an impartial manner. A presiding or participating employee may at any time disqualify himself. On the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case.

(c) Subject to published rules of the agency and within its powers, employees presiding at hearings may—

(1) administer oaths and affirmations;

(2) issue subpenas authorized by law;

(3) rule on offers of proof and receive relevant evidence;

(4) take depositions or have depositions taken when the ends of justice would be served;

(5) regulate the course of the hearing;

(6) hold conferences for the settlement or simplification of the issues by consent of the parties or by the use of alternative means of dispute resolution as provided in subchapter IV of this chapter;

(7) inform the parties as to the availability of one or more alternative means of dispute resolution, and encourage use of such methods;

(8) require the attendance at any conference held pursuant to paragraph (6) of at least one representative of each party who has authority to negotiate concerning resolution of issues in controversy;

(9) dispose of procedural requests or similar matters;

(10) make or recommend decisions in accordance with section 557 of this title; and

(11) take other action authorized by agency rule consistent with this subchapter.

(d) Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence. A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence. The agency may, to the extent consistent with the interests of justice and the policy of the underlying statutes administered by the agency, consider a violation of section 557(d) of this title sufficient grounds for a decision adverse to a party who has knowingly committed such violation or knowingly caused such violation to occur. A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. In rule making or determining claims for money or benefits or applications for initial licenses an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.

(e) The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the exclusive record for decision in accordance with section 557 of this title and, on payment of lawfully prescribed costs, shall be made available to the parties. When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 386; Pub. L. 94–409, § 4(c), Sept. 13, 1976, 90 Stat. 1247; Pub. L. 95–251, § 2(a)(1), Mar. 27, 1978, 92 Stat. 183; Pub. L. 101–552, § 4(a), Nov. 15, 1990, 104 Stat. 2737.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1006. | June 11, 1946, ch. 324, § 7, 60 Stat. 241. |

In subsection (b), the words "hearing examiners" are substituted for "examiners" in paragraph (3) for clar-

A-1

ity. The prohibition in the second sentence is restated in positive form and the words "This subchapter does not" are substituted for "but nothing in this chapter shall be deemed to". The words "employee" and "employees" are substituted for "officer" and "officers" in view of the definition of "employee" in section 2105. The sentence "A presiding or participating employee may at any time disqualify himself." is substituted for the words "Any such officer may at any time withdraw if he deems himself disqualified."

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

### Editorial Notes

#### AMENDMENTS

1990—Subsec. (c)(6). Pub. L. 101–552, §4(a)(1), inserted before semicolon at end "or by the use of alternative means of dispute resolution as provided in subchapter IV of this chapter".

Subsec. (c)(7) to (11). Pub. L. 101–552, §4(a)(2), added pars. (7) and (8) and redesignated former pars. (7) to (9) as (9) to (11), respectively.

1978—Subsec. (b)(3). Pub. L. 95–251 substituted "administrative law judges" for "hearing examiners".

1976—Subsec. (d). Pub. L. 94–409 inserted provisions relating to consideration by agency of a violation under section 557(d) of this title.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–409 effective 180 days after Sept. 13, 1976, see section 6 of Pub. L. 94–409, set out as an Effective Date note under section 552b of this title.

### Executive Documents

#### HEARING EXAMINERS EMPLOYED BY DEPARTMENT OF AGRICULTURE

Functions vested by this subchapter in hearing examiners employed by Department of Agriculture not included in functions of officers, agencies, and employees of that Department transferred to Secretary of Agriculture by 1953 Reorg. Plan No. 2, §1, eff. June 4, 1953, 18 F.R. 3219, 67 Stat. 633, set out in the Appendix to this title.

#### HEARING EXAMINERS EMPLOYED BY DEPARTMENT OF COMMERCE

Functions vested by this subchapter in hearing examiners employed by Department of Commerce not included in functions of officers, agencies, and employees of that Department transferred to Secretary of Commerce by 1950 Reorg. Plan No. 5, §1, eff. May 24, 1950, 15 F.R. 3174, 64 Stat. 1263, set out in the Appendix to this title.

#### HEARING EXAMINERS EMPLOYED BY DEPARTMENT OF THE INTERIOR

Functions vested by this subchapter in hearing examiners employed by Department of the Interior not included in functions of officers, agencies, and employees of that Department transferred to Secretary of the Interior by 1950 Reorg. Plan No. 3, §1, eff. May 24, 1950, 15 F.R. 3174, 64 Stat. 1262, set out in the Appendix to this title.

#### HEARING EXAMINERS EMPLOYED BY DEPARTMENT OF JUSTICE

Functions vested by this subchapter in hearing examiners employed by Department of Justice not included in functions of officers, agencies, and employees of that Department transferred to Attorney General by 1950 Reorg. Plan No. 2, §1, eff. May 24, 1950, 15 F.R. 3173, 64 Stat. 1261, set out in the Appendix to this title.

#### HEARING EXAMINERS EMPLOYED BY DEPARTMENT OF LABOR

Functions vested by this subchapter in hearing examiners employed by Department of Labor not included in functions of officers, agencies, and employees of that Department transferred to Secretary of Labor by 1950 Reorg. Plan No. 6, §1, eff. May 24, 1950, 15 F.R. 3174, 64 Stat. 1263, set out in the Appendix to this title.

#### HEARING EXAMINERS EMPLOYED BY DEPARTMENT OF THE TREASURY

Functions vested by this subchapter in hearing examiners employed by Department of the Treasury not included in functions of officers, agencies, and employees of that Department transferred to Secretary of the Treasury by 1950 Reorg. Plan. No. 26, §1, eff. July 31, 1950, 15 F.R. 4935, 64 Stat. 1280, set out in the Appendix to this title.

## § 557. Initial decisions; conclusiveness; review by agency; submissions by parties; contents of decisions; record

(a) This section applies, according to the provisions thereof, when a hearing is required to be conducted in accordance with section 556 of this title.

(b) When the agency did not preside at the reception of the evidence, the presiding employee or, in cases not subject to section 554(d) of this title, an employee qualified to preside at hearings pursuant to section 556 of this title, shall initially decide the case unless the agency requires, either in specific cases or by general rule, the entire record to be certified to it for decision. When the presiding employee makes an initial decision, that decision then becomes the decision of the agency without further proceedings unless there is an appeal to, or review on motion of, the agency within time provided by rule. On appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule. When the agency makes the decision without having presided at the reception of the evidence, the presiding employee or an employee qualified to preside at hearings pursuant to section 556 of this title shall first recommend a decision, except that in rule making or determining applications for initial licenses—

(1) instead thereof the agency may issue a tentative decision or one of its responsible employees may recommend a decision; or

(2) this procedure may be omitted in a case in which the agency finds on the record that due and timely execution of its functions imperatively and unavoidably so requires.

(c) Before a recommended, initial, or tentative decision, or a decision on agency review of the decision of subordinate employees, the parties are entitled to a reasonable opportunity to submit for the consideration of the employees participating in the decisions—

(1) proposed findings and conclusions; or

(2) exceptions to the decisions or recommended decisions of subordinate employees or to tentative agency decisions; and

(3) supporting reasons for the exceptions or proposed findings or conclusions.

The record shall show the ruling on each finding, conclusion, or exception presented. All deci-

denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, §10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

### § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a

A-4

## § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

### (a) Just and reasonable rates

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

### (b) Preference or advantage unlawful

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

### (c) Schedules

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

### (d) Notice required for rate changes

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

### (e) Suspension of new rates; hearings; five-month period

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and de-livering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

### (f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142.)

AMENDMENTS

1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted "sixty" for "thirty" in two places.

Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

§ 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined

Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies

of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms ''electric utility companies'' and ''registered holding company'' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term ''short-term sale'' means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term ''applicable Commission rule'' means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by

the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

(June 10, 1920, ch. 285, pt. II, § 206, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 852; amended Pub. L. 100–473, § 2, Oct. 6, 1988, 102 Stat. 2299; Pub. L. 109–58, title XII, §§ 1285, 1286, 1295(b), Aug. 8, 2005, 119 Stat. 980, 981, 985.)

REFERENCES IN TEXT

The Public Utility Holding Company Act of 1935, referred to in subsec. (c), is title I of act Aug. 26, 1935, ch. 687, 49 Stat. 803, as amended, which was classified generally to chapter 2C (§ 79 et seq.) of Title 15, Commerce and Trade, prior to repeal by Pub. L. 109–58, title XII, § 1263, Aug. 8, 2005, 119 Stat. 974. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, § 1295(b)(1), substituted ''hearing held'' for ''hearing had'' in first sentence.

Subsec. (b). Pub. L. 109–58, § 1295(b)(2), struck out ''the public utility to make'' before ''refunds of any amounts paid'' in seventh sentence.

Pub. L. 109–58, § 1285, in second sentence, substituted ''the date of the filing of such complaint nor later than 5 months after the filing of such complaint'' for ''the date 60 days after the filing of such complaint nor later than 5 months after the expiration of such 60-day period'', in third sentence, substituted ''the date of the publication'' for ''the date 60 days after the publication'' and ''5 months after the publication date'' for ''5 months after the expiration of such 60-day period'', and in fifth sentence, substituted ''If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision'' for ''If no final decision is rendered by the refund effective date or by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, whichever is earlier, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision''.

Subsec. (e). Pub. L. 109–58, § 1286, added subsec. (e).

1988—Subsec. (a). Pub. L. 100–473, § 2(1), inserted provisions for a statement of reasons for listed changes, hearings, and specification of issues.

Subsecs. (b) to (d). Pub. L. 100–473, § 2(2), added subsecs. (b) and (c) and redesignated former subsec. (b) as (d).

EFFECTIVE DATE OF 1988 AMENDMENT

Section 4 of Pub. L. 100–473 provided that: ''The amendments made by this Act [amending this section] are not applicable to complaints filed or motions initiated before the date of enactment of this Act [Oct. 6, 1988] pursuant to section 206 of the Federal Power Act [this section]: *Provided, however*, That such complaints may be withdrawn and refiled without prejudice.''

[1] See References in Text note below.

LIMITATION ON AUTHORITY PROVIDED

Section 3 of Pub. L. 100–473 provided that: "Nothing in subsection (c) of section 206 of the Federal Power Act, as amended (16 U.S.C. 824e(c)) shall be interpreted to confer upon the Federal Energy Regulatory Commission any authority not granted to it elsewhere in such Act [16 U.S.C. 791a et seq.] to issue an order that (1) requires a decrease in system production or transmission costs to be paid by one or more electric utility companies of a registered holding company; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company. For purposes of this section, the terms 'electric utility companies' and 'registered holding company' shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C. 79 et seq.]."

STUDY

Section 5 of Pub. L. 100–473 directed that, no earlier than three years and no later than four years after Oct. 6, 1988, Federal Energy Regulatory Commission perform a study of effect of amendments to this section, analyzing (1) impact, if any, of such amendments on cost of capital paid by public utilities, (2) any change in average time taken to resolve proceedings under this section, and (3) such other matters as Commission may deem appropriate in public interest, with study to be sent to Committee on Energy and Natural Resources of Senate and Committee on Energy and Commerce of House of Representatives.

## § 824f. Ordering furnishing of adequate service

Whenever the Commission, upon complaint of a State commission, after notice to each State commission and public utility affected and after opportunity for hearing, shall find that any interstate service of any public utility is inadequate or insufficient, the Commission shall determine the proper, adequate, or sufficient service to be furnished, and shall fix the same by its order, rule, or regulation: *Provided*, That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel the public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers.

(June 10, 1920, ch. 285, pt. II, § 207, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

## § 824g. Ascertainment of cost of property and depreciation

### (a) Investigation of property costs

The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property.

### (b) Request for inventory and cost statements

Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction.

(June 10, 1920, ch. 285, pt. II, § 208, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

## § 824h. References to State boards by Commission

### (a) Composition of boards; force and effect of proceedings

The Commission may refer any matter arising in the administration of this subchapter to a board to be composed of a member or members, as determined by the Commission, from the State or each of the States affected or to be affected by such matter. Any such board shall be vested with the same power and be subject to the same duties and liabilities as in the case of a member of the Commission when designated by the Commission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The board shall be appointed by the Commission from persons nominated by the State commission of each State affected or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

### (b) Cooperation with State commissions

The Commission may confer with any State commission regarding the relationship between rate structures, costs, accounts, charges, practices, classifications, and regulations of public utilities subject to the jurisdiction of such State commission and of the Commission; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

### (c) Availability of information and reports to State commissions; Commission experts

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of public utilities. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may upon request from a State make available to such State as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement to the Commission by such State of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 10, 1920, ch. 285, pt. II, § 209, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 853.)

ation, management, and control of all facilities for such generation, transmission, distribution, and sale; the capacity and output thereof and the relationship between the two; the cost of generation, transmission, and distribution; the rates, charges, and contracts in respect of the sale of electric energy and its service to residential, rural, commercial, and industrial consumers and other purchasers by private and public agencies; and the relation of any or all such facts to the development of navigation, industry, commerce, and the national defense. The Commission shall report to Congress the results of investigations made under authority of this section.

(June 10, 1920, ch. 285, pt. III, § 311, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 859.)

## § 825k. Publication and sale of reports

The Commission may provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use, and is authorized to sell at reasonable prices copies of all maps, atlases, and reports as it may from time to time publish. Such reasonable prices may include the cost of compilation, composition, and reproduction. The Commission is also authorized to make such charges as it deems reasonable for special statistical services and other special or periodic services. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Public Printer under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Printing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided,* That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further,* That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, § 312, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 859.)

### CODIFICATION

''Sections 1535 and 1536 of title 31'' substituted in text for ''sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])'' on authority of Pub. L. 97–258, § 4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the

hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, §313, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 860; amended June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, §1284(c), Aug. 8, 2005, 119 Stat. 980.)

CODIFICATION

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, §16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, §16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

### §825m. Enforcement provisions

**(a) Enjoining and restraining violations**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

**(b) Writs of mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

**(c) Employment of attorneys**

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

**(d) Prohibitions on violators**

In any proceedings under subsection (a) of this section, the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 824u of this title (and related rules and regulations) from—

   (1) acting as an officer or director of an electric utility; or
   (2) engaging in the business of purchasing or selling—
      (A) electric energy; or
      (B) transmission services subject to the jurisdiction of the Commission.

(June 10, 1920, ch. 285, pt. III, §314, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 861; amended June 25, 1936, ch. 804, 49 Stat. 1921; June 25, 1948, ch. 646, §32(b), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 109–58, title XII, §1288, Aug. 8, 2005, 119 Stat. 982.)

CODIFICATION

As originally enacted subsecs. (a) and (b) contained references to the Supreme Court of the District of Columbia. Act June 25, 1936, substituted "the district court of the United States for the District of Columbia" for "the Supreme Court of the District of Columbia", and act June 25, 1948, as amended by act May 24, 1949, substituted "United States District Court for the District of Columbia" for "district court of the United States for the District of Columbia". However, the words "United States District Court for the District of Columbia" have been deleted entirely as superfluous in